The PRESIDENT, DIRECTORS, and COMPANY of the STATE BANK
BANK of VINCENNES, the STATE BANK of INDIANA, v. THE STATE.
v. the STATE of INDIANA.

| 1b 267̄
153   486

1b 267|
155   456|
155   461|

The 10th article of the state constitution, providing that the Bank of *Vin-cennes* shall be considered as an incorporated bank according to the tenor of its charter, gives no new powers or privileges to the bank; but only continues its existence under the state government, with the same powers and privileges that it had previously enjoyed.

The clause in the bank charter—that the corporation shall not be dissolved before the expiration of its charter, until its debts are paid—does not protect the corporation from a dissolution, in a proceeding by quo warranto for a *violation* of the charter; that clause being intended merely to prevent the corporation from dissolving itself, before the expiration of the charter, without paying its debts.

The 12th section of the 1st article of the state constitution—that no person shall be put to answer any criminal charge, but by presentment, indictment, or impeachment—does not prohibit a quo warranto information: this proceeding being criminal only in name and form; *in its nature it is purely ci-vil.*

A summons or venire facias is the usual process against corporations in the first instance; and on non-appearance a distringas issues. At any rate, if, in the case of a summons, the defendants appear and plead, they cannot afterwards object because a more rigid process had not issued against them.

The want of a venue in a quo warranto information, which in its nature is a civil proceeding, is cured by a verdict.

The words "*Knox* county and circuit," in the margin of an information there filed, though they be not expressly referred to, may imperfectly serve for a venue through the whole case. And where it appeared from the law and the record, that the information against the bank at *Vincennes,* was filed in the *Knox* Circuit Court at that place, and charged the bank with misconduct which might have there occurred, it was held that this, with the imperfect venue in the margin, showed that the defect, if any, as to the venue, was of the lowest grade of informality.

In the information against a bank, it is only necessary that the time and other circumstances, in the description of one of the charges showing a violation of the charter, be certain to a common intent.

The bank cannot assign for error, that no fine had been assessed against it; the fine being merely nominal, and its non-assessment no error: besides, the omission is for the defendant's benefit.

The following offences, charged and proved against the bank, are each a forfeiture of the charter: 1st, the contracting of debts to a greater amount than double that of the deposites; 2dly, the issuing of more paper, with a fraudulent intention, than the bank could redeem; 3dly, the making of large dividends of profits, while the bank refused to pay specie for its notes; and 4thly, the embezzling of large sums of money deposited in the bank for safe-keeping.

Nov. Term,
1823.

STATE BANK
v.
THE STATE.

The whole corporation is answerable, so far as its franchises are in question, for the misconduct of the president and directors, or other select body, in the management of the concerns under their control.

The 7th section of the 1st article of the state constitution—that no man's property shall be taken for public use, without the consent of his representatives, &c.—does not prohibit a judgment of seizure of a corporation's franchises for a violation of the charter, let the effect upon private property be what it may.

The judgment against a corporation, in the case of a forfeiture of its charter, is, that the franchises be seized into the hands of the state.

The statute of 1821, directing this suit against the Bank of *Vincennes*, was not intended to determine that the judgment of seizure could be extended to the property of the corporation.

The dissolution of a corporation may be effected by a seizure of its franchises. The franchises, however, are not thereby destroyed; they exist in the hands of the state, and may be afterwards granted to the same or other individuals: but the existence of the corporation is terminated, and it ceases to be the owner or possessor of lands or goods, rights or credits.

Semble, that the corporation is not dissolved by the judgment of seizure, but that it continues to exist until the franchises are seized by an execution on the judgment.

Semble, that, upon the dissolution of a corporation, its lands and tenements revert to the grantor and his heirs; and that its goods and chattels become vested in the state. The debts due to or from the corporation are extinguished by its dissolution.

The judgment against a corporation, for a violation of its charter, must be confined to a seizure of the franchises. If it be extended to a seizure of the property of the corporation, that part of the judgment will be erroneous.

Friday,
November 7.

ERROR to the *Knox* Circuit Court.

HOLMAN, J.—The Bank of *Vincennes* was incorporated, by an act of the territorial legislature, in 1814. When the state constitution was formed, its charter was recognized and confirmed. By an act approved *January* 1st, 1817, its capital and powers were enlarged, and it was adopted as the state bank of *Indiana*. In the session of 1821, it was suggested to the legislature, that the said banking company had violated their charter. Whereupon they passed an act, directing the governor to appoint an agent to cause suit to be instituted against them in the name of the state, in the *Knox* Circuit Court, by writ of quo warranto, or such other process as such agent should deem most advisable, for the purpose of determining whether they had violated their charter. Agreeably to the requisition of said act, an information in the nature of a quo warranto was filed, in the *Knox* Circuit Court, against the president, directors, and company of said bank. A summons was issued against them. They appeared by their attorney, and pleaded the acts of assembly a-

foresaid as their charter for exercising their several franchises. The replication sets forth a variety of breaches of the said charter, whereby it alleged that they had forfeited all right to act as a corporation, or to exercise any of the franchises that had been granted to them. To all of which breaches, the defendants specially rejoined, not guilty. On the trial, the jury found the defendants guilty of all the breaches as set forth, except three, which they enumerated, of which they found them not guilty. There are nine charges of which the defendants were thus found guilty; to wit, 1st, they were indebted on the 1st of *January*, 1821, and on divers days and times between that day and the filing of the information, in a much larger sum than double the amount of money actually deposited with them for safe-keeping, with an intent to defraud, &c.; 2dly, they have not made such demands on the stockholders for the payment of shares as were necessary to meet the legal demands on the bank; 3dly, they have attempted virtually to dissolve the corporation without the payment of large sums of money due by them, with an intent to defraud, &c.; first, by receiving the assignment of stock in said bank in payment of debts due to it; secondly, by concealing the names of the president and directors of said corporation; 4thly, they have, by their own acts, put it out of their power to lend the state the sum of 50,000 dollars, either in specie or par paper; 5thly, they have, with intent to defraud, &c., issued paper to a vast amount, which, at the time of issuing, they knew they had not the means of redeeming, and which they have not redeemed, and cannot redeem; 6thly, they have made large dividends of profits, while they have refused to redeem their notes in specie, or in any thing else; 7thly, they have virtually refused to credit the state, by a transfer of their demands against it to the *United States;* 8thly, they have established branches at more places than the capital stock of said bank would authorize, and without the payment in specie by individuals of the sum of 30,000 dollars; 9thly, they have embezzled large sums of money, deposited with them for safe-keeping by the agent of the *United States* and others, to the amount of 250,000 dollars. A motion in arrest of judgment was made and overruled, and judgment given, "that the privileges, liberties, and franchises, of said president, directors, and company of the said bank, be seized into the hands and custody of the said state; together with all and singular their goods

and chattels, rights, credits, and effects, and all and singular their lands, tenements, and hereditaments, of what kind, nature, and description, soever, with costs, &c."

The defendants have brought up those proceedings by writ of error, and have assigned various errors in the record, which we shall severally examine.

1st. The judgment seizes on the corporate franchises, contrary to the act of incorporation, confirmed by the state constitution.—Reliance is here placed on that part of the act of 1814 which enacts, that "said corporation shall not be dissolved previous to the expiration of its charter, until all its debts, &c. shall be finally settled;" and also on the 10th article of the constitution, which says, "the Bank of *Vincennes*, and the Farmers and Mechanics' Bank of *Indiana* at *Madison*, shall be considered as incorporated banks, according to the true intent and meaning of their charters." In examining this part of the case, it may be premised, that this article of the constitution has no bearing on the construction to be given to the charter of this bank. It is intended to give the bank no new powers or privileges; but to continue its existence under the state government, with the same powers and privileges that it enjoyed under the territorial government. It recognizes it as a chartered bank, according to the true intent of its charter, the act of 1814. So that the claim of the plaintiffs in error to an indissoluble corporation, must stand or fall on a fair construction of that act. By the first section of the act, the subscribers to the bank are made a corporation by the name and style of The President, Directors, and Company of the Bank of *Vincennes*, and to continue so until the 1st day of *October*, 1835; and the clause under consideration provides, that they shall not be dissolved before that time, until all their debts are paid. In determining whether those provisions have created an indissoluble corporation, we need not inquire into the power of the legislature to create such a body politic; nor have we any thing to do with the policy of such a measure further than this, that when a measure would be highly injurious we are not to presume the legislature would adopt it; therefore, in seeking the meaning of doubtful words in legislative acts, we should always presume the representatives of the people would pursue safe instead of dangerous measures. And the idea of a banking company, with a capital of a million and a half of dollars, created an indissoluble corporation

for the term of 21 years, must be highly alarming to the community. A chartered right of acting with impunity is derogatory to the spirit of our government; and, when connected with so much power, might be highly destructive of those equal rights guarantied by our constitution. It would therefore require the most unequivocal terms to induce a belief, that the legislature that gave, or the convention that confirmed this charter, contemplated the conferring of such dangerous and destructive privileges. But, independently of this consideration, it is evident that this clause in the charter was not inserted for the benefit of the banking company, but for the safeguard of those to whom they might become indebted. The various restrictions that run through their charter, are predicated on the idea of their accountability for transcending the bounds therein prescribed. Inasmuch as they had the power of contracting debts, issuing paper, and receiving deposites to a vast amount, and must necessarily have the power of determining their corporate existence at any period unless restrained; 1 Bl. Com. 485; 2 Kyd on Cor. 446, 466, and the authorities there cited; it was thought necessary by the legislature to insert this clause to prevent a dissolution of the corporation, by any act of its members, before all its debts were paid. This clause implies a liberty of dissolving the corporation at any time, on the payment of its debts. And as the payment of the debts was the duty of the corporation, any privilege given, or restriction imposed, on such a condition, must be supposed to be given to or imposed on those whose duty it would be to perform the condition. Had the legislature intended restraining the state from any proceedings by which the corporation might be dissolved, they would not have annexed such a condition as this; a condition not to be performed by the state but by the corporation, and which would have put it in the power of the corporation to render the restriction absolute by a refusal to perform it. For it cannot be supposed that the legislature intended that the state should pay the debts, in order to enable it to proceed against the corporation for any violation of the charter. The provision at the conclusion of this clause of the charter, "that after the expiration of their charter they shall not transact business, &c. further than to settle and close their contracts as above provided," goes strongly to confirm this construction, that the intention of the legislature was to restrain the corporation from a dissolution by any act of

its own until its debts were discharged. We therefore con. clude, in the language of the Circuit Court on the motion in arrest of judgment, that "this is not a privilege granted to the corporation, but a right retained by the state" as a guarantee to the various creditors of the bank; and that it will not secure the corporation from a dissolution by a seizure of its franchises.

2dly. An information in the nature of a quo warranto is a mode of proceeding not warranted by the constitution.—That part of the constitution here supposed to be violated, is the 12th section of the 1st article, which provides that "no person shall be put to answer any criminal charge but by presentment, indictment, or impeachment." We might answer this assignment by a reference to the long and uniform practice of the *British* Courts, authorizing proceedings by information for misdemeanors and minor offences, notwithstanding the language of magna charta, the grand palladium of *English* liberty, and the celebrated instrument from which this part of our constitution is copied; but we have no need of resorting to the general doctrine on informations, for a quo warranto information is a criminal proceeding only in name and in form, in its nature it is purely a civil proceeding. See 2 Kyd on Cor. 439.—*The King* v. *Francis,* 2 T. R. 484. In the language used in *The King* v. *The Mayor, &c. of Cambridge,* cited in 2 Kyd on Cor. 483, the corporation is called upon to answer to no crime or offence, but only touching its liberties. The primary and only material object of the proceedings, is not the infliction of pains or penalties as in criminal proceedings, but to deprive the individual members of the supposed corporation of privileges they claim to enjoy above the lot of the citizens in general. The fine inflicted on a conviction is merely nominal. It is so immaterial a part of the proceedings, that the books on the subject of corporations have almost lost sight of it. The conclusion of the judgment, it is true, is said to be with a *capias pro fine.* But this is more the form than the substance of the judgment, as in all civil actions founded on tort; for when the proceedings are by writ of quo warranto, the conclusion of the judgment is, that the defendants be in mercy, &c., as in civil actions founded on contract. 2 Kyd on Cor. 409. The fine authorized by the act of 1819, p. 156, to be inflicted in quo warranto informations, is not embraced by this case, as that act extends only to usurpations of office. So that, with us, the fine may be very properly left out of the case; and

then the proceedings are so conclusively of a civil nature, as to form no colourable pretence for this constitutional objection.

3dly.    The process should have been a distringas and not a summons.—But the practice is otherwise.    A summons or venire facias is the usual process against corporations in the first instance, and if the defendants fail to appear a distringas then issues.  2 Kyd on Cor. 404, 5.—Carth. 503.    But the defendants have appeared and pleaded, and cannot now be heard to complain that a more rigid process was not issued against them.

4thly.  The information is void for want of certainty as to time, place, &c.—Here the information and the replication containing the several breaches, are very properly considered as one instrument, and the objections are made to the charges as alleged against the corporation.    The principal objection is, that no place is set forth where the usurpation, or the several transactions occasioning a forfeiture of the franchises, took place.  It is urged in behalf of the state, that inasmuch as the object of the venue is to give jurisdiction to the proper Court, and jurisdiction is here given to the *Knox* Circuit Court by the act of assembly directing these proceedings, therefore a venue was unnecessary.    But it may be considered, that where the jurisdiction over a transaction is local and important, the jurisdiction attaches the moment the transaction takes place; and that here a proper jurisdiction must have existed before the passage of this act; and if the *Knox* Circuit Court had no jurisdiction previously to the act of assembly, the propriety of changing the jurisdiction, by a legislative act, in a case where the state is a party, without the consent of the opposite party, might be deemed very questionable.  We therefore feel disposed to conclude, that the legislature did not intend changing the jurisdiction, or even settling a doubtful question on the subject, but named the *Knox* Circuit Court as the place where the proceedings were to be had, from a belief that the charges alleged against the corporation were properly inquirable into in that Court.  In this view of the subject, the question as to the venue remains unsettled by the act of assembly.    In looking into the books we have seen no case where the point is expressly decided.    The statutes of jeofails do not directly embrace informations, the 9th of Anne, ch. 20, sec. 7, excepted, which only extends to the usurpation of corporate offices.    But they may be amended, as was the case in *The King* v. *Wilkes*, 4 Burr. 2527; and quo war-

35

Nov. Term, ranto informations being in the nature of civil proceedings, most
1823.    of the principles regulating civil suits are applicable to them.
STATE BANK. This case, after verdict, may be assimilated to a case in *England*
v.    after judgment by *nihil dicit*, where the want of a venue is not
THE STATE. error.   7 Bac. 48.   It is a general rule, that where a matter is
of a transitory nature the venue is immaterial; and many of the
transactions here charged, as the contracting of debts, the issu-
ing of paper, &c., may have taken place any where, and if they
could be inquired of in any other county except where the bank
is established, they might be inquired of in any county in the
state.   But in this case we are not entirely without a venue.   In
the margin of the information we have "*Knox* county and cir-
cuit," which may serve, though imperfectly, for a venue through
the whole case, although nowhere referred to in express words.
Add to this, that the record informs us that the Court for the trial
of this cause was held at *Vincennes*, in the *Knox* circuit.   Then
we have from the law and the record certain charges exhibited
against the president, directors, and company of the bank of
*Vincennes*, the state bank of *Indiana*, originally established at *Vin-
cennes*, in an information filed in the *Knox* Circuit Court—char-
ges of such a nature as may be supposed to have taken place
where the bank was established, and transacted its business.
This, being connected with the imperfect venue in the mar-
gin, if it will not render the venue perfect, will at least show
that the defect is one of the lowest grades of informality.   The
time and other circumstances, in the description of the princi-
pal charges, appear to be certain to every common intent.
There are several charges which are unimportant, and, from
the manner in which they are laid, it might be doubtful whether
they could be supposed to be a violation of the charter; but it
may be remembered that if any one of the charges, which a-
mounts to a violation of the charter, is sufficiently described, it
will support the verdict.   And we think the first, fifth, sixth,
and ninth charges are described with all the certainty that
could be expected from the nature of the transactions.   We
shall have occasion, hereafter, to examine whether any or all of
those charges are sufficient to authorize the seizure of the fran-
chises.

5thly.   There is no fine assessed to the state.—It has been al-
ready shown that the fine in this case is merely nominal.   Its
absence cannot be error.   Even in the case of the usurpation of

offices, by the act of 1819, the fining of the defendant may be considered in the discretion of the Court. But here if the omission was improper, it is so conclusively for the benefit of the defendants that they cannot assign it for error.

Passing the sixth assignment for future remarks, and the seventh which is the general error, we shall now examine the eighth, viz. There is no charge contained in the information which in point of law warrants the judgment.—That a corporation may forfeit its charter for misusing or abusing its franchises, is a doctrine that cannot now be disputed.   See 1 Bl. Com. 485.—2 Kyd on Cor. 474, and the cases there cited.   For there is an implied condition annexed to each particular grant, which, if violated, forfeits the whole franchise. 2 Bac. 31. Inasmuch as it is the duty of corporations to act up to the end or design for which they were created; 1 Bl. Com. 480; so when they pursue such measures as wholly frustrate this design, the reason of their existence ceases, and it is but just that their existence should also be terminated.   Whether every slight deviation from the intention of the charter should occasion a forfeiture is not the question; but when the grand, leading conditions and restrictions in the charter have been violated, there can be no question but the franchises are thereby forfeited.   Several of the charges, found by the jury against this corporation, are of this nature, and show that they have evidently abused their most important privileges to the manifest injury of others and of the community in general.   We shall examine a part of those charges.   The eighth fundamental article of the constitution of said corporation is, that the total amount of debts which said corporation should at any time owe, should not exceed double the amount of moneys actually deposited in the bank for safekeeping.   And it is expressly found by the jury, that they were indebted on the 1st day of *January*, 1821 and at divers days and times between that day and the filing of the information, in a much larger sum than double the amount of moneys actually deposited in the bank for safe-keeping.   This was unquestionably a violation of their charter.   Although provision is made, in this article, for rendering the directors under whose administration an excess of debts should be created, personally liable for the amount of such excess by action of debt, &c.; yet this violation of this article is no less chargeable against the corporation, than if no such provision had been made.   It is also found,

that they, with intent to defraud, &c., issued paper to a vast a-mount, which, at the time of issuing, they knew they had not the means of redeeming, and which they have not redeemed and cannot redeem. This charge, although not in violation of any express provision of their charter, is evidently contrary to the intent and spirit of the grant. One of the main objects of the institution was, to make a profit by issuing paper or bank notes; and the plain design of the whole charter, and of several provisions in particular, was, that they should not issue more paper than they could honestly redeem. Here they are found guilty of knowingly issuing, with a fraudulent intention, more than they had the means of redeeming. The privilege of their charter, and of bank charters generally, allows an issue of paper greater than could be redeemed, if it were all brought forward for redemption at the same point of time; but it must be within the power of those institutions, to form a tolerably correct estimate of the amount of paper they can redeem in the ordinary course of business. How much soever, therefore, the inability of a banking company to redeem all their paper, at any particular period, might be excused by the peculiar circumstances in which they might be placed; yet when they knowingly transcend the bounds of honesty by an exorbitant issue of paper, and thus wilfully destroy their ability to meet the just demands against them, they lose all colour of excuse, and violate the first principles of their existence. And there can be no doubt but such a procedure is a breach of the implied conditions on which they received this liberty of issuing paper, and is consequently a forfeiture of such liberty. Intimately connected with this subject is the charge of making large dividends of profits, while they refused to redeem their notes in specie or in any thing else. If they were, at the time of those dividends, able to redeem their notes and refused to do so, it manifests a fraudulent intention; if they were then unable to redeem them, their conduct shows a predetermination to continue so. The charge of embezzling large sums of money deposited with them for safe-keeping by the *United States*, &c., is also a violation of the first principles of their charter, and evidently shows that they cannot be safely trusted with such important privileges. But it is urged that those charges are only against the president and directors of the corporation, and not against the stockholders who compose the great body of the company; and that the franchises should not be seized to the

manifest injury of the whole corporation by the misconduct of a few. But it must be recollected that where the government of a corporation exists in a select body, as is the case in most corporations, the act of the select body is the act of the corporation. See 1 Kyd on Cor. 308, 9, and the cases there cited. Here, although the election of directors and the making of by-laws existed with the shareholders, yet the management of the whole moneyed concern, which was the principal object of the institution, was evidently under the control of the president and directors; and their acts in relation thereto were obligatory on the whole body. All the charges we have examined, were within the proper sphere of the president and directors; and the whole corporation are answerable for their misconduct, so far as their franchises are in question. But in these charges, the whole corporation, by their corporate name, are charged and found guilty, and of course all are included therein.

9thly. The Court refused to instruct the jury that the evidence was insufficient to authorize a verdict of guilty.—A motion was made for the Court to instruct the jury to this effect, and on their refusal to give such instruction a bill of exceptions was filed, in which the whole of the evidence is set forth. We shall only examine so much of this evidence as relates to the charges we have just examined. It was proved by three witnesses, that the corporation was indebted in more than double the amount of money deposited with it for safe-keeping. *Boudinot*, one of those witnesses, deposes that such was the condition of the bank in 1821, and for two years previously thereto; and that they had lent out the money deposited with them by the *United States*. *Beeman*, another of those witnesses, deposes as to the debts of the bank being more than double the amount of their available funds, and that two dividends of profits had been declared since the bank refused to pay specie. And *Prince*, the other of those three witnesses, deposes that the bank was indebted about 373,000 dollars, and had at the same time but 31 dollars in specie, and no other available funds; and that 208,000 dollars of that sum were due for money deposited by the *United States*. The testimony of these witnesses clearly establishes the several facts of the corporation's being excessively indebted, making improper dividends, and embezzling the money deposited by the *United States*. The charge of issuing more paper than they had the means of redeeming, is also put beyond a

doubt; but whether this paper was issued knowingly or not, rests entirely on presumption. Had they issued no more paper than they were authorized to issue, and thereby kept their debts within the limits prescribed by their charter, they might still have been unable to redeem all their paper; but in that case the presumption would have been, that at the time they became thus indebted they had no intention to defraud their creditors. But when we see them transcending those bounds, and not only creating debts to a vast amount, but even after they had discovered their inability to redeem their notes, still increasing the demands against them, and lessening their ability to discharge those demands, by making dividends of profits to the stockholders, and lending out all the money deposited with them by the *United States*, &c., and all their own funds except the trifling sum of 31 dollars, the presumption becomes irresistible, that they knew at the time many of those debts were created they could not discharge them; and, at the time they issued a large portion of their paper, they must have known that they had not the means of redeeming it, and that in the ordinary course of business they never could redeem it. We therefore deem the circumstances sufficiently strong to authorize the jury to find this charge as laid, and conclude that the Court acted correctly in refusing the instructions required.

We now return to the sixth assignment, which is, That that part of the judgment which authorizes a seizure of the private property of the corporation, is repugnant to the constitution.—We are not able to discover that our constitution produces any alteration in the proper form of the judgment against such a corporation as this. There is nothing in this case that falls within the seventh section of the first article of the constitution, "That no man's property shall be taken for public use, without the consent of his representatives," &c. If there are individuals, (as it is contended the stockholders are,) who have a separate property in the bank, and that separate property is of such a nature that it can exist independently of the corporation, or after it is dissolved, the judgment has no effect upon it; but the owner is entitled to it, notwithstanding the judgment, in the same manner he was before. But if it be contended that such a private property exists in the individual shareholders, as will be destroyed if the franchises of the corporation be seized; and, inasmuch as the private property is guarantied

by the constitution, that the constitution must also of necessity guaranty the continued existence of those franchises, or otherwise this property will be annihilated; we shall find that this doctrine is not warranted by the constitution. The privilege of holding stock in this bank is inseparably connected with its existence as a corporation, and inasmuch as we have seen that the existence of the corporation depends on the implied condition that it will not violate its charter, so this privilege of holding stock in this bank must depend for its continuance on the same implied condition. The president and directors of the corporation become the agents of the stockholder, and if they violate the conditions on which he enjoys this privilege, his privilege is *immediately subject to forfeiture by this act of his agents.* Nor will the regard which the constitution has for private property, secure such property from annihilation by a dissolution of the corporation. So that we see nothing in the constitution to prevent the seizure of those franchises, let the effect upon private property be what it may. And there can be no doubt but that this judgment, so far as it authorizes a seizure of the franchises into the hands and custody of the state, is warranted by law. When it appears that the liberty has been once granted, and is forfeited by misuser or non-user, the judgment shall be that it be seized into the king's hands. Year-book, 15 Ed. 4, cited in 2 Kyd on Cor. 407. And such appears to be the law at present. Thus far every thing appears to be regular. But when we proceed to that part of the judgment, that authorizes a seizure into the hands of the state of all the goods and chattels, rights, credits, and effects, together with all and singular the lands, tenements, and hereditaments of the corporation, we are compelled to pause and minutely examine the ground on which this part of the judgment has been founded. We are aware that several sections of the act of assembly, directing those proceedings against this corporation, are predicated on the idea, that if the corporation had so misused and abused its franchises as to render them liable to seizure, a seizure of the goods and chattels, rights, credits, and effects, lands, tenements, &c. of the corporation, would necessarily form a part of the judgment; for the third section of the act directs them to be seized by the execution on the judgment. But we cannot suppose that the legislature intended to alter the law on this subject, for their provisions extend only to this particular case:

Nov. Term, 1823.

STATE BANK
v.
THE STATE.

and even if those provisions were of a general nature, we should have to give them a retrospective operation to bring this case within them; inasmuch as all the forfeitures to which this corporation was liable, were incurred before the passage of the act. In fact, the act does not seem intended to increase the liabilities of the corporation, or in any way extend the forfeiture to which they were subject. It appears to be enacted for no other purpose, but to have the corporation called upon to account for the supposed violation of their franchises, and, if they had abused their liberties, to subject them to all the losses and forfeitures to which by law they were liable in consequence thereof, supposing that such forfeitures necessarily included all their corporate property, together with their rights and credits; and so proceeds to direct the manner in which their property, rights, credits, &c., shall be disposed of. Therefore, taking the whole act together, we cannot suppose that the legislature intended making or declaring the law which was to govern the rendition of this judgment, but that the law on the subject remains as heretofore. This is also evident from the direction they give, that the judgment shall be given according to the course of the common law and the usages of Courts, not inconsistent with the laws of this state. With this view of the act of assembly, we shall examine this judgment by the law as it stood before the passage of the act. The most of the cases to be found in the books against corporations, are where the corporations have been created for the purposes of government, and calculated for perpetuity; and where the property of the corporation, whether real or personal, has formed a very inconsiderable feature in the case. Of course, the effect of the judgment on the property of corporations has been but seldom a question, and is much less explained than the effect of the judgment on the franchises. There is a tedious labyrinth of cases through which we have to travel on this subject, and many of the landmarks are so dim and uncertain that we are frequently at a loss to know whether we are on safe and tenable ground. It is certain, however, that the dissolution of a corporation is effected by a seizure of its franchises, although the franchises themselves are not thereby destroyed, for they exist in the hands of the state, and may be afterwards granted to the same or other individuals, in the same manner in which they were originally granted. But the existence of the corporation is terminated. Its being is so com-

pletely lost that it can have no power over, nor connexion with, any thing in existence; of course, it can no longer be considered as the owner or possessor of lands or goods, rights or credits. But it does not follow that those lands and goods, rights and credits, necessarily fall into the hands of the state; much less that they are proper objects to be included in the terms of the judgment. There are but two grounds on which it can be contended, that the corporate effects fall into the hands of the state: 1st, as a forfeiture for abusing the franchises; or 2dly, for the want of an owner by the dissolution of the corporation. When we examine the first of these grounds, we find nothing in the books to support an idea, that the abuse of corporate franchises occasions a forfeiture of lands or goods, rights or credits, or in fact occasions any other forfeiture but the franchises themselves. The consequence of a breach of the implied condition on which their liberties were granted, was not that they should forfeit their property or possessions if they abused their franchises, but only that they should forfeit the franchises. That which comes out of the hands of the king, is the proper subject of forfeiture; the king, by the seizure, resuming what originally flowed from his bounty. Authorities leading to this conclusion are numerous. See the cases cited in 2 Bac. 32, and in *The King* v. *Amery,* 2 T. R. 515. For the forfeiture is the same for non-user, when no property has been held or rights exercised, as for misuser or abuser, after the possession of much property and the exercise of extensive rights and credits; and the judgment is the same in both cases. Consequently, the judgment could not direct a seizure of the corporate possessions, as a forfeiture for the violation of the charter. Nor is the second ground—that the property falls to the state for the want of an owner, on the dissolution of the corporation—more tenable as a foundation on which to sustain this judgment. For the ownership of the corporation does not cease until its dissolution. And whether it is dissolved by the judgment of seizure or not, until the state has execution on that judgment, is not here very material. For if the corporation is dissolved by the judgment, the judgment must be regularly entered, and have its full effect, before the dissolution takes place; and it is not till then that the property can be said to be without an owner. The loss of the property to the corporation is a consequence of the judgment; and it is a contradiction of the first principles of reason—a complete re-

Nov. Term, versal of effect and cause—to make such loss of property a part
1823.      of the judgment. That which cannot exist until after the judg-
STATE BANK ment, can never be the subject-matter on which the judgment
    v.     is given. But the better opinion seems to be, that the corpora-
THE STATE. tion is not dissolved by the judgment of seizure; but that it ex-
ists until the franchises are seized by execution on that judgment.
See 2 Kyd on Cor. 409, 10, and the authorities there cited.
Consequently, the last shadow of a support for this judgment,
on this ground, must vanish.

We have thus far examined the judgment which directs a
seizure of the goods and chattels, rights and credits, lands and
tenements, of the corporation, on the assumed position that they
will necessarily fall to the state on the dissolution of the corpo-
ration. We shall now inquire into the correctness of this posi-
tion. In order to elucidate the subject, we shall examine it in
detail; and in the 1st place inquire, what becomes of the lands
and tenements—2dly, what becomes of the goods and chattels
—and 3dly, what becomes of the rights and credits, of the corpo-
ration: and we shall find that each of these three items is go-
verned by different principles. 1st. As to the lands and tene-
ments.—"When a corporation is dissolved," says Sir Wm.
Blackstone, "the lands and tenements revert to the person or his
heirs who granted them to the corporation; for the law doth
annex a condition to every such grant, that if the corporation
be dissolved, the grantor shall have the lands again. The grant
is only during the life of the corporation, which may endure
forever; but when that life is determined by the dissolution of
the body politic, the grantor takes it back by reversion, as in
the case of every other grant for life." 1 Bl. Com. 484. This
is the doctrine advanced by Lord Coke. Co. Litt. 13 b. See
also 2 Kyd on Cor. 516,—2 Bac. 32,—2 Cruise, 493,—and Col-
chester v. Seaber, 3 Burr. 1866. We see but little in the books
that contradicts or questions those authorities, and the cases that
look a different way, maintain that the lands would escheat. 2
Bac. 32. If either of those principles be correct, we feel war-
ranted in determining that the corporate lands and tenements
cannot be seized into the hands of the state, and certainly not
in the manner contemplated by this judgment. 2dly. As to the
goods and chattels.—On this subject the books are almost si-
lent. In the argument of Colchester v. Seaber, it is said by Sir
Fletcher Norton, on the authority of 1 Ro. Ab. 816, that the

goods and chattels go to the crown. An *English* writer, who has collected together most of the cases on corporations, concludes his remarks on the effect of a dissolution in these words: "What becomes of the personal estate is, perhaps, not decided; but probably it vests in the crown." 2 Kyd on Cor. 516. We do not feel under the necessity of resolving any doubts which may rest on this subject; for if the law were conclusive, that the goods and chattels in this case would vest in the state on the dissolution of the corporation, yet we have already seen that this would not be as a forfeiture, but because they were without an owner, and that the claim of the state could not exist until after judgment; consequently, it is impossible to include them in the terms of the judgment. 3dly. As to the rights and credits of the corporation.—These, as applying to the debts, &c. due to the corporation, are supposed to be of considerable amount, and have formed a principal feature in every view of this case. But the importance of the case, arising from the amount in controversy, cannot affect the principles by which it is governed; and when those principles are fixed they must be declared, let the consequence to individuals or the community be what it may. That the debts are necessarily lost to the corporation, naturally follows from the principles we have examined. For when dissolved they have no existence, and can have no claim to, nor control over, any thing whatever. They not only die, but leave no representative behind them. This, in every respect, is the case with aggregate corporations. Sole corporations depend, in this respect, upon principles somewhat different; but with them we have now no concern. But although the debts fall out of the lifeless hands of the corporation, at the same time with their real and personal estate, yet when thus out of their hands, they are very different in their natures from the real and personal estate. Land and goods have a necessary existence, although they may be without an owner in being or in expectancy. They continue in being, and may be made the subject of possession by occupancy. But this is not the case with respect to debts. They have no necessary existence, and are so conclusively personal, that they cannot exist without an obligor and obligee in being, or in expectancy. And on the death of the obligor or obligee, without the possibility of a representative, the obligation ceases. Such appears to be the case on the dissolution of a corporation aggregate. Blackstone

Nov. Term,
1823.

STATE BANK
v.
THE STATE.

says, "the debts of a corporation, either to or from it, are totally extinguished by its dissolution; so that the members thereof cannot recover, or be charged with them, in their natural capacities.    1 Bl. Com. 484.    2 Kyd on Cor. 516, uses the same language.  2 Bac. 32, advances nearly the same doctrine, on the authority of Lev. 237;  Owen, 73;  and 2 And. 107.    And this doctrine is either directly or indirectly supported in a variety of cases.    See the before-mentioned case of *Colchester* v. *Seaber*. Also *Rex* v. *Pasmore*, 3 T. R. 199.—*The Mayor, &c. of Scarborough* v. *Butler*, 3 Lev. 237.—4 Com. Dig. 273.    If this doctrine be correct, and we find it uncontradicted, the seizure of the rights and credits of the corporation is impossible in the nature of things;  because their existence ceases as the claim of the state commences.    But even if they could be seized into the hands of the state they would be unavailing.    The debts due to the corporation could not, on any common law principle, be collected by the state or its agent;  there being no privity of contract, either in fact or law, between the state and the debtor to the corporation.    It is true, that when the powers of the corporation have lain dormant for many years, and have afterwards been revived by a new charter, they have been considered capable of collecting debts formerly due to them.    This was the case in *Colchester* v. *Seaber*.    And even when the name of the corporation has been changed by letters patent, they have collected debts due to them by their former name.    This was done in *The Mayor, &c. of Scarborough* v. *Butler*.    But these cases were decided on the principle, that the corporation that sued was, virtually and substantially, the same body that made the contract, and to whom the obligation was properly due.    But such is not the case with the state.    It has no connexion with the obligor or the obligation, and cannot recover the debt by suit.    Nor does the act of assembly, authorizing the collection of the corporation debts by commissioners to be appointed for that purpose, make any alteration in the case.  This act was not intended to make a new law to regulate those debts, or to alter the principles that governed the' corporation contracts;  but seems founded on the supposition that the debts would become due to the state by the seizure of the corporate franchises, and therefore makes provision for having them collected by commissioners.    There is nothing in the act calculated to give those debts a continued existence after the dissolution of the corpora

tion. The act only presumes they would by law have such an existence, and therefore makes a disposition of them. The debts must therefore be considered, on common law principles, unaffected by the act; and therefore subject to extinguishment by a dissolution of the corporation.

Thus, in no view of the case, can that part of the judgment which directs a seizure, into the hands of the state, of the goods and chattels, rights, credits, and effects, lands, tenements, and hereditaments of the corporation, be supported.

BLACKFORD, J. was absent.

*Per Curiam.*—That part of the judgment which awards, that the privileges, liberties, and franchises of the defendants below, be seized into the custody of the state, is affirmed; and that part which awards, that their goods and chattels, rights, credits, and effects, lands, tenements, and hereditaments, be seized into the custody of the state, is reversed. To be certified, &c.

*Tabbs* and *Test*, for the plaintiffs.

