STATE *v.* JOHNSON.

SUPREME COURT—*Power to issue Writs of Mandamus and Quo Warranto.*—Under the present Constitution, the Supreme Court, in the exercise of its original jurisdiction, has power to issue writs of *mandamus* and *quo warranto*.

SCHEDULE TO CONSTITUTION—*Construction of.*—That clause of the schedule to the Constitution (sec. 10), requiring all officers to qualify "within fifteen days after they shall have been duly notified of their election or appointment," is mandatory, and, for the purpose designed, has all the force and effect of a provision of the Constitution, and is to be construed by the same rules.

The command, and the use of the word "shall," in the schedule, denotes command, that the officer shall qualify within fifteen days after having been duly notified of his election, is nothing more nor less than a grant to qualify within that time.

Where the Constitution designates, in express and explicit terms, the precise time when a fundamental act shall be done, and is *utterly silent* as to the performance at any other time, it cannot be done at any other time.

TRIAL BY JURY—*To what cases does not extend, etc.*—The right of trial by jury, at common law, did not extend to summary proceedings, nor to civil proceedings against a public officer, and the proceeding by *quo warranto*, is nothing more nor less than a civil proceeding against a public officer.

The Constitution having given this court jurisdiction to issue the writs, *with power to hear and determine the same,* the court has the power to determine the facts arising on the writs in which it exercises jurisdiction.

*Petition for Quo Warranto.*

*Montgomery*, Attorney General, *Yonley and E. W. Gantt*, for the State.

*Watkins & Rose*, *Rice & Benjamin*, *Gallagher*, *Newton & Hempstead, and English*, *Gantt & English*, for respondent.

McCLURE, C. J.

On the 14th of December, 1870, at the suggestion of the attorney general, a rule to show cause was awarded against the respondent, why a writ of *quo warranto* should not be issued against him.

On the 23d of January, a response was filed to the rule, and a demurrer to the suggestion or information of the attorney general. The first cause of demurrer is, that this court has no jurisdiction; the second is, that the information or suggestion shows no sufficient cause of action.

The question of jurisdiction is substantially settled in the case of *Price & Barton v. Page, treasurer, 25 Ark., 557*. While it is conceded that, in the case referred to, the application was for a *mandamus*, the determination of the power to issue that writ, by virtue of the original jurisdiction of this court, necessarily disposed of the jurisdiction of the court in cases of *quo warranto*. And, in exercising the jurisdiction, we do not stand alone: Judges RINGO, DICKINSON, LACEY, JOHNSON, OLDHAM, CROSS, PASCHAL, SEBASTIAN, CONWAY and WALKER, men whose names are familiar to the legal fraternity of the State, and whose erudition and legal lore are second to none who have succeded them, held, for a period of more than fifteen years, after the adoption of the Constitution of 1836, that this court had orginal jurisdiction in *mandamus* and *quo warranto*.

From 1851 to 1864, this court held that it had no original jurisdiction in *mandamus* and *quo warranto*. In 1864, Judges PIKE, ENGLISH and COMPTON reversed the opinion of 1851, and followed in the wake of Judges RINGO, DICKINSON, JOHNSON, OLDHAM, CROSS, PASCHAL, SEBASTIAN, CONWAY and WALKER. It

may be urged that the opinion urged by Judges PIKE, ENGLISH and COMPTON in 1864, is not entitled to much weight, they being the Judges of the Supreme Court at a time when Arkansas was supposed to belong to the Confederate States.

To this it may be replied, that Judges PIKE, ENGLISH and COMPTON were construing the provisions of the Constitution of 1861, which is *identical* with that of 1836, construed by Judge SCOTT; that they were acting under the solemnity of an oath that bound their consciences and controled their legal judgments, to the same extent, as was the conscience and judgment of Judge SCOTT bound. As lawyers, and men of legal ability, they have few equals and no superiors; and whether the opinion and decision in *The State v. Samuel W. Williams*, has the force of a judgment now, it is, at least, entitled to much respect and weight, emanating, as it does, from such a high source.

In the case of *The State v. Williams*, we find the following language, on the subject of jurisdiction of this court in *quo warranto:* "We, therefore, declare it to be now the opinion of this court, that, in cases involving the civil rights of the State as sovereign, affecting vitally its character and the proper administration of the government, in which the public has a direct and immediate interest, and when the right to a public office, franchise, liberty or privilege is the subject matter of the controversy, *this court is, by the Constitution, invested with the original jurisdiction*, to be exercised by means of a writ of *mandamus* or *quo warranto*, according as the State may, by her attorney general, ask for one or the other, in order to cause the admission of the proper person to, or to oust the party illegally holding such public office, franchise, liberty or privilege, with power, not only to issue the writ, but to hear and determine the same, being *pro hoc vice*, both a court of first instance and in the last resort. But we will not extend the remedy beyond the limits prescribed by the old writ, nor permit private persons to interfere and file relations in this court."

Feeling that we are fully sustained in exercising jurisdiction

in *mandamus* and *quo warranto*, by Judges familiar with the law, its practice and its precedents, we will now take up the second ground of demurrer. The question raised by the second ground is: "Is that clause of the schedule to the Constitution of 1868, directory or mandatory, as to qualifying within fifteen days after receiving notice of election?"

It is urged by counsel for respondent, that the clause in the schedule is directory and not mandatory. It is also urged that the schedule is but an ordinance of the convention, and that the rule of construction, applicable to statutes, should apply, rather than that applicable to Constitutions. In the case of *Ridley v. Sherbrook*, (*3 Cold. 569,*) the Supreme Court of Tennessee held, that, "the provisions of the schedule, for the purpose for which they were designed, *had all the force of Constitutional provisions.*" This is the only decision upon the subject we have been able to find, in the limited search we have made, and having no disposition to question the correctness of the decision of that court, we will proceed to discuss whether the provision was mandatory or directory.

It is urged by counsel for the respondent, that, "statutes directing the mode of proceeding by public officers are directory, and are not regarded as essential to the validity of the proceedings themselves, unless it be so declared in the statute." While, to some extent, this is a general rule, yet it by no means follows that it is an universal rule. In the case of the *People v. Cook*, (*14 Barb. 290, 8 N. Y. 67,*) the rule contended for by respondent was laid down, and it is insisted, is applicable to this case. We are unable to comprehend the analogy, and it does not exist; for there is a vast difference between a statute that directs how an officer shall proceed *after* he is an officer, and a statute that directs how he shall proceed in order to *become* an officer.

Treating the schedule to the Constitution in the light of a mere ordinance of the convention, and entitled to no more consideration than an act of the Legislature, let us see if it is directory or mandatory. It declares that "*All* officers *shall*

qualify and enter upon the discharge of the duties of their offices, within fifteen days after they have been duly notified of their election or appointment." (Sec. 10, Sched.) One of the first rules of construction is, to ascertain the intention of the law-making power, and carry that intention into effect, if it do not contravene the fundamental law of the land. It is not insisted, that the determination, that the clause of the schedule above quoted, as either a mandatory or directory provision, would contravene any provision of the Constitution, and all that now remains for us to determine is, whether it is mandatory or directory. Another well established rule of construction is, "where there is nothing doubtful—nothing ambiguous—no words made use of which operate to defeat the manifest intention of the Legislature, there is nothing left for construction." (*2 Ohio, 65; 9 Ohio, 558.*) Now let us apply these plain simple rules to the language before us. "All officers *shall* qualify and enter upon the discharge of their offices, within fifteen days after they have been duly notified of their election or appointment." Is there any thing doubtful about the meaning of this language? Is there any thing ambiguous about it? Is it not plain and easy of comprehension? Is there any reason why any new term should be interpolated into the clause quoted, in order to save any natural or acquired right to the citizen? There is none that we know of, and in the absence of a necessity, we are unable to see why it should be done. If the Lieutenant Governor failed to qualify within the fifteen days, or wholly failed to qualify, the existence or permanency of the State government would not have been jeopardized, nor would any public or private interest have suffered. It is true that the Constitution makes it his duty to preside in the deliberations of the Senate, but his failure to preside would not work a suspension of legislation, for the Constitution provides for the election of a President *pro tempore.* If the schedule declared that all persons elected under the provisions thereof, should qualify before entering upon the discharge of the duties of their respective offices, and fixed no specific time

within which the qualification should take place, such a provision would have been directory, but such is not the character of the schedule. The command, and the use of the word "shall," denotes command, that the officer *shall* qualify within fifteen days after having been duly notified of his election, is nothing more nor less than a grant to qualify within that time.

Another well settled rule of construction is, that "no word ever should be *rejected*, if the statute will admit of a rational and consistent construction, without rejecting it." *3 Ohio,. 193; 8 Ohio State, 564.* Now, why should the words, "within fifteen days after they have been duly notified of their election or appointment," be stricken out of the schedule? It is reasonable to presume that these words were placed in the schedule for some purpose, if so, what right have we to reject them, or treat them as surplusage?

What reason or object could the Constitutional Convention have had by the use of the words, "within fifteen days after they have been duly notified of their election or appointment," *if it was not to place a limitation on the time* in which an officer was to qualify? The mere insertion of any number of days, within which an officer was to qualify, evidences an intention to limit the time in which the person elected or appointed,. should qualify.

But counsel for respondent urge that there is no declaration that the person elected shall not qualify *after* the fifteen days,. *and that because there is not,* that qualification at any subsequent time may be pleaded in bar against the State, in an action or proceeding commenced to recover the office from one who has not complied with the terms of the grant. If this should be the rule of construction applied to statutes, it would become necessary for the Legislature, in every instance, in a statute to declare, if the thing to be done was not done at the time fixed by law, that it should be void. This rule of construction would create interminiable confusion with a large majority of our present statutes, and work irreparable mischief if it once attained a foothold.

In Maine, (*6 Shepley, 548*,) the question was presented to the Supreme Court, whether the Legislature could make an apportionment, at a time other than that named in the Constitution, and the court laid down the law to be, that "where the Constitution designates in express and explicit terms, the precise time when a fundamental act shall be done, and is *utterly silent* as to the performance at any other time, it cannot be done at any other time." In the case now before us the schedule declares that the qualification shall take place within fifteen days after notice. The Tennessee courts say, that the schedule, for the purposes, is as binding as any other portion of the Constitution. The schedule is silent as to qualification, at any other time after the fifteen days, and in such case, the Supreme Court of Maine say, that where the Constitution is silent as to the performance at any other time, it cannot be done at any other time. Believing this to be the better rule of construction, as applicable to a case of this kind, we are clearly of opinion that the demurrer should be overruled.

On the 17th of February, 1871, the respondent filed certain affidavits in support of the response to the rule to show cause. The attorney general then informed the court, that he desired to, and could successfully, controvert the facts set forth in the affidavits, and in order that he might have that opportunity, it was ordered that the writ of *quo warranto* issue, as the only question about which there is any controversy is, whether the Lieutenant-Governor qualified within fifteen days after having been duly notified of his election.

To the writ of *quo warranto*, a response was filed, setting up really two pleas :

*First*, That the Congress of the United States, by an act, passed March 2, 1867, entitled "An act to provide for the more efficient government of the rebel States," had declared that, "no legal State government existed in the State of Arkansas;" and that under the provisions of said act, and acts supplemental thereto, it was the object and intent of said acts to enable the people of Arkansas to form a State government,

republican in form, by the framing and adoption of a Constitution, in conformity with the Constitution of the United States, and which should provide that the elective franchise shall be enjoyed by the persons mentioned in said act, and the adoption of article fourteen, by the Legislature of said State, and when said article shall have become a part of the Constitution of the United States, said State shall be declared entitled to representation in Congress, and that then and thereafter, the preceding sections of said act shall be inoperative in said State. The plea insists, if such an expression may be allowed in this connection, that the present Constitution did not go into effect until the 22d of June, 1868, and that he qualified more than fifteen days before that date, as Lieutenant-Governor of the State of Arkansas.

[The second plea sets up that he qualified as Lieutenant-Governor within fifteen days after he was duly notified of his election. To the first plea, the attorney general filed a demurrer, and a replication as to the second.]

[The demurrer to the first plea was sustained. On the 20th of February, the respondent filed a motion for a jury to try the issue of fact presented by the second plea, the replication and similiter.]

McCLURE, C. J.

Here we have a question presented for our consideration, that is not free from difficulty. On the one hand, to refuse a jury to try the issue of fact presented, is at variance with the ideas usually announced from the political rostrum, or spoken of in unguarded terms by the sycophant and demagogue, who caters and bends to public opinion, "that thrift may follow fawning." On the other, we are constrained in our action by the solemnity of an oath, and the limits of the Constitution. Our Constitution declares, "The right of trial by jury shall remain inviolate, and shall extend to all cases at law, without regard to the amount in controversy." Counsel for the re-

spondent urge, that this provision of the Bill of Rights entitles him to a jury to pass upon the question of fact.

It has been truly said that "a Constitution is not the beginning of government," and that it is adopted with a knowledge that it is, and was made in harmony and consonance with the condition of things existing at the time of its adoption.

In the Constitution of 1836, the 6th section of the Bill of Rights, declares that, "the right of trial by jury should remain inviolate." It will be observed that the Constitution of 1868, in addition to declaring "the right of trial by jury shall remain inviolate," adds the words, "and shall extend to all cases at law, without regard to the amount in controversy." Have the words added, any meaning, or are they mere senseless things? Why are they added? Shall these words be treated as a redundant expression, in order to bring this proceeding within the rule contended for by the respondent?

In the case of the *State v. Ashley*, (*1 Ark. 284*), the point was made, in argument, by Judge Watkins, who was attorney in that case, that the court could not exercise original jurisdiction in *quo warranto*, because, in the determination of the proceeding, matters of fact usually, and almost necessarily arise; and that in the exercise of the power to hear and determine the same, inasmuch as this court had not been provided with a jury, it being a well settled principle of the law, that whether the jurisdiction was original or appellate, the jurisdiction could not be exercised without the intervention of an act of the Legislature, would controvene that provision of the Bill of Rights, which asserts "the right of trial by jury shall remain inviolate."

In response to this position Mr. Pike said, it "hardly merits notice." He further states that the right of trial by jury was the right of trial, "existing at the adoption of the Constitution," which was, that "every man shall be tried by his peers of the vicinage," and that no free man shall be arrested or im-

19

prisoned, or deprived of his free hold, except by the regular judgment of his peers, or the law of the land."

Chief Justice RINGO, after hearing these arguments, in a very able and elaborate opinion, held that the court had *jurisdiction*, but he no where states or gives any expression upon the argument presented, and it is fairly inferable that the exercise of jurisdiction, in his opinion, did not controvene the right of trial by jury.

It will be admitted, by those of the profession, who are familiar with the practice of the law, that the proceedings in which a jury was not required at common law, that the clause of the Constitution, declaring the right of trial by jury, shall remain inviolate, does not give it.

When the Constitution was framed, adopted and ratified by the framers and the people, it was well known that this court was not provided with a jury, or the means to procure it, and yet, with this knowledge before them, they gave this court jurisdiction in *mandamus* and *quo warranto, with power to hear and determine the same.* That the people, themselves, had not only the right, but power to provide that this court should determine questions of fact, arising on the writs, in which it exercises jurisdiction, we presume will not be denied.

Whether the right of trial by jury ever existed as a matter of right in *quo warranto*, is not a matter easily determined, by direct precedent. The respondent claims that such is the uniform practice, not only in this country, but in England, and in support of that position, quite a number of authorities have been submitted to our consideration. On a careful examination of the authorities cited, we have found them to apply to *informations in the nature of a quo warranto*, the former being a criminal prosecution, and the latter a proceeding upon a writ, in the nature of a writ of right, which partakes more of what is now known as a summary proceeding, than a "case at law."

The right of trial by jury, at common law, never existed in equitable proceedings, in admiralty or summary proceedings, or proceedings against officers of a civil nature, nor did it

exist in cases where private property was taken for public use, and yet in all these proceedings, questions of fact, involving the tenure to property in untold amounts, are adjudicated upon by the courts, without the intervention of a jury.

So far as we can now trace the right of trial by jury, at common law, it did not extend to equitable actions, admiralty or summary proceedings, nor in cases where private property was taken for public use, nor in procedings *in rem*, nor in civil proceedings against public officers, and this proceeding is nothing more or less than a civil proceeding against a public officer. By Magna Charta, it is declared that "no freeman shall be arrested or imprisoned, or deprived of his *freehold*, except by the regular judgment of his peers, or the law of the land."

In the seventeenth year of the reign of King John, at Runnymede, these concessions were made by the crown, and from that time forward, to some extent, the rights of Englishmen have been determined by the concession then made. King John's construction of the concession was, that it did not protect the "*goods and chattels;*" and, as an evidence of this, we have but to refer the unread to history of the time, and it will be found that armed forces were sent against the secret enemies of the king, and they were despoiled of their goods, without observing any form of law. Langton and his associates, and many others, were thrown into prison and despoiled of their goods, without the intervention of a jury, notwithstanding Magna Charta. *Ling. His. Eng.*, vol. *2*, *225 n.* So far as our research has extended, the right of trial by jury, at common law, only extended to criminal prosecutions, and in actions where a freehold or goods and chattels were in dispute.

The term, "goods and chattels," includes personal property, choses in action, and chattels real. The right to an office is neither personal property, or a chose in action, or chattels real, in the sense used at law. In information in the nature of a *quo warranto*, it is expressly provided by an act of parliament, (*3 Geo.*, *2 ch.*, *25*), that a jury shall be struck before a proper

officer, on the demand of the king or the respondent. This statute was passed for the special purpose and to the end that his majesty's courts, at Westminster, might be provided with juries to try questions of fact. If this right existed before this time, it was certainly a work of supererogation on the part of parliament to enact the law, and the inference to be drawn from this fact is, that, prior to the date of the statute, the issues of fact were tried by the court, even in cases of informations in the nature of *quo warranto*, which, at best, is but little more than a summary proceeding to ascertain the right to an office.

As yet, this court is the only tribunal in the State having jurisdiction in *quo warranto*. Under the Constitution of 1836, the circuit courts were courts of original jurisdiction; they are not so now; the circuit courts are mere creatures of the Legislature, and without any constitutional jurisdiction. It is clear that the eighteenth section of the Civil Code, regulating the jurisdiction of the circuit courts, does not confer upon them the power to hear and determine the high prerogative writs used for the protection of the sovereignty of the State. It is not intended to intimate that the Legislature has no power to confer the jurisdiction, but that it has not conferred it.

We have already stated that, when the members of the convention framed and adopted the present Constitution, they were well aware that this court was not to have a jury, and that the jurisdiction in these writs was conferred with a full knowledge of this fact. The proceeding at law is not a criminal action, and yet, from the tearful and pathetic argument of the counsel, one would be led to suppose that the respondent was being tried for murder or treason, and the argument is based upon the false assumption that his client is to be hanged, without the intervention of a jury. The object of this proceeding is to require the respondent to come into court, and show the title to the office, the functions of which he has been exercising. If he has title, no harm can befall him; if he

has no title, he is simply ousted from the office, whose functions he has usurped. No penalty, imprisonment or fine is imposed, no matter what way the judgment goes.

It has been frequently held, that right of trial by jury, at common law, never extended to cases of defaulting or delinquent officers of the government. *2 Stew., 131; 6 Man., 641; Hardin's Rep., 5; 17 Ala., 516*, and the States in. which these holdings have been made, have denied a jury when demanded, on the sole ground that, in actions against public officers, the right of trial by jury did not exist at common law, if the actions were not of a criminal nature. Believing this to be the correct distinction, we are unable to see wherein the denial of a jury would contravene the right of trial by jury, as it existed at common law, or as it existed at the adoption of the Constitution. If we were to consult our own conscience, or desired to shirk the duty imposed on us by the Constitution, we should at once order a jury, to dispose of this question; but, inasmuch as neither the Constitution nor the Legislature has provided this court with a jury, or the means of obtaining one; and, inasmuch as there would be no court in the State, with jurisdiction, to protect the officers of the State from usurpation, if this court were to refuse to exercise the jurisdiction conferred, we feel it to be our duty, under all the circumstances, to overrule the motion for a jury.

[On the 20th of February, 1871, a motion for a jury was filed, under XIV. amendment to the Constitution of the United States.]

MCCLURE, C. J.

We see nothing in this motion that was not really disposed of in the first demand for a jury. We have carefully examined the opinion of Judge BRADLEY, submitted by counsel for respondent, and can come to no other conclusion than that he made a hasty and ill-advised *obiter dictum*, in the case referred to; and, as an evidence of this fact, we direct attention of coun-

sel to the fact that he says the civil rights bill and the XIV. amendment have no relation to each other.

On the very next day he comes into court and says that he is convinced that he was in error in that respect, and recants his position of the day previous. This, taken in connection with the fact that the case turned on a question of jurisdiction, and that the remarks made were not pertinent to the disposition of the case, entitles the argument to no more weight than that of any other lawyer of equal ability. The fourteenth amendment originated in Congress, and many of the same men who aided in proposing the amendment to the States, were in Congress when the enforcement act was passed. Under such circumstances it will not be unreasonable to presume that congressional construction is of as much weight on that subject as the opinion of Judge BRADLEY. Congress, under the authority given that body, to enforce the amendments, undertakes to define the rights sought to be preserved and protected by the fourteenth amendment, and by the sixteenth section of said act it is declared, "That all persons within the jurisdiction of the United States, shall have the same right in every State and territory of the United States, to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and none other; any law, statute, ordinance, regulation or custom, to the contrary notwithstanding. No tax or charge shall be imposed or enforced by any State upon any person immigrating thereto from a foreign country, which is not equally imposed and enforced upon any person immigrating to such State from any other foreign country; and any law of any State, in conflict with this provision, is hereby declared null and void." There seems to be no intention to extend the right of trial by jury to cases where it did not exist before, and we do not think the fourteenth amendment was adopted for any such purpose. The motion is overruled.

[On the 22d of February, 1871, a motion was made to dismiss for want of jurisdiction, on the ground that this court had no power or authority to impanel a jury.]

McClure, C. J.

It has already been very clearly intimated that this court would hear the facts in this proceeding and dispose of the case on its merits. If the case should be dismissed at this stage, the jurisdiction in *quo warranto* would cease when an issue of fact was presented for trial, and the result of such a holding would be that it would have jurisdiction in cases where no question of fact was presented, and that if a question of fact should be presented, this court would be ousted of jurisdiction. The jurisdiction of this court is not to be measured, nor does it hang upon so feeble a tenure.

[On the 25th of February, 1871, the court, after hearing the evidence, delivered the following opinion.]

McClure, C. J.

The court are unanimously of opinion that the evidence presented in this case shows that the respondent qualified and entered upon the discharge of his duties within the time prescribed in the schedule. The fact of election of respondent being conceded, the only thing at issue in the case is established. It is therefore considered that the respondent have and use and exercise the rights, privileges and franchises of the office of Lieutenant Governor of the State of Arkansas, and that he be allowed his costs in this behalf expended.

Gregg, J., dissenting, says:

The relation of the attorney general, after announcing that the respondent had usurped and exercised the office of Lieu-

tenant Governor without warrant or sufficient authority, admits his election to that office, but alleges that he failed to take his oath of office and enter upon the duties thereof, within fifteen days after he was notified of his said election.

*Second.* That he refused to qualify according to law, and file a copy of his oath in the office of the secretary of State, whereby he had forfeited any right he may have had to that office.

It has been intimated, in argument, that a *quo warranto* is a favored prosecution; but upon the demurrer to this writ, it has not been contended that the attorney general, in his relation, is not bound to state facts which, if true, by law, the respondent is not entitled to hold the office; in other words, he must state facts which show that the State is entitled to a judgment of ouster.

In this, as in other suits at law, the pleader should state facts, matters issuable, and not conclusions or inferences of law; and if the facts charged constitute no cause of action against the accused, he may suggest that to the court, and be relieved from making any response. This is the ground assumed by the respondent here, and denied by the relator.

The latter clause of the tenth article of the schedule to the Constitution of 1868, declares that, "all officers shall qualify and enter upon the discharge of the duties of their offices within fifteen (15) days after they have been duly notified of their election or appointment."

The principal questions urged upon the attention of the court are :

*First.* The relator urges that this clause in the schedule is mandatory, and must be complied with; and if respondent failed to comply therewith he forfeited all rights he had acquired to the office, and could not afterwards assume the franchises, powers and privileges of that office. And the respondent urges that this clause of the schedule is directory, and if the party does not take the oath of office within the time stated he may thereafter take such oath and enter upon the duties of

the office; and that if a failure to take such oath within the time is a violation of said clause, there is no penalty affixed for such neglect or violation, and it is not within the scope of judicial authority to create a penalty or declare what that penalty shall be.

Although this precise case is new in this court, there have been many questions strikingly analogous in principle to the ones here presented.

Mr. Sedgewick, in his work on statutory and constitutional law, 368, says: "When statutes direct certain proceedings to be done in a certain way, *or at a certain time*, and a strict compliance with these provisions of time and form does not appear essential to the judicial mind, the proceedings are held valid though the command of the statute is disregarded or disobeyed." See, to the same points, *Cooley's Const. Lim.*, 74, *et srq.*

Whether or not the general principle here enunciated, is applicable to the case before the court, depends upon the question as to whether or not the time for taking the official oath, as stated in this schedule, is of the essence of the thing to be done. To arrive at that we should look to the purport, meaning and intent of this act, or schedule. A Constitution had been framed, the fundamental principles of an original law had been agreed upon, and now it was desired to have the assent of the people to this fundamental law; and the delegates then undertook to direct in what manner the people should express their assent or dissent to this law, and in what manner they should choose officers to fill the various positions provided for in such organic law, and at what time and in what manner these officers should enter upon the discharge of the duties of their respective offices. It directs how the elections shall be held; provides for commissioners and judges of elections; directs how elections may be contested, and the result declared; and, in short, prescribes the manner of forming a government, in accord with the organic law thus agreed upon. This ordinance was to declare the manner of getting up the machinery

of the new government. This schedule was no part of the fundamental law of that government, as was insisted in argument. Instead of being a part of those "fundamental maxims and unvarying fixed rules by which all departments of the State government should at all times shape their course," it was a most fleeting and temporary enactment; instead of being declared a principle to regulate law-makers as well as individuals, it fixed its own hasty dissolution. That fundamental law, like a will of the schedule, could not go into full force and effect until all the functions of the schedule had been performed. The termination of its existence was the recognized beginning of the Constitution's authority and power over the people, and the departments of the State; therefore, instead of this being of the ground work, or fundamental principles of government, it did not even claim the stability of an ordinary statute; it pretended only a temporary existence, *for a temporary purpose*, and in all of its offices it was most peculiarly advisory—directing the manner of forming an organization which was to carry out the laws enacted. And the taking the oath of office was a preliminary step to the object intended.

If the person elected, failed or refused to qualify as directed, the proper authorities might have taken measures to declare the office vacant; but if no such steps were taken, and no vacancy declared until he came forward and qualified, and entered upon the duties of the office, no forfeiture could be declared; and all penalties for non-compliance with statute law, should be fixed by law, and a court cannot say forfeiture of the office shall be the penalty, when the law-making department have not so declared.

In the case of *Glidden v. Towle, 11 Foster, 166–7*, the Supreme Court of New Hampshire, held, upon a statute requiring town officers to appear and take an oath within six days after their election, that, "These are general provisions in regard to town officers, but they apply to fence viewers in the same manner as though specifically enacted in regard to them. Were it

made to appear that the fence viewer, in question, had been duly notified of his election, as required by statute, and had neglected to take the oath of office, as therein stated, the selectmen might, perhaps, have treated his conduct as a refusal to accept the office, and appointed another in his stead. But nothing of the kind appears, and, in the absence of any time being fixed in which a vacancy is declared to exist, or of any one being appointed in his stead, we see no objection to his taking the oath at the time he did, and of his entering upon the duties of his office." (He was elected in March, and did not take the oath until the 26th of July following.)

In case where a sheriff, by statute, was required to file bond within twenty days after notice of his election, the Supreme Court of New York, held, "that the statute may be considered in that respect, directory to the sheriff merely, and not as imposing an absolute limitation upon him." *12 Wend. 483.*

In the case of the Mohawk and Hudson Railroad Company, the Supreme Court of New York, said: "The statute requiring inspectors of corporate elections to take an oath, is simply directory in its terms, and without any nullifying clause, on account of omission," etc. *19 Wend. 143.* Nor is there any nullifying clause in the schedule under consideration.

The court of appeals, in New Jersey, in the case of *Kearney v. Andrews, 2 Stockton's Ch. 24,* under a statute that required the officers of a town to take an oath of office within ten days after an election, say "it was directory, only, and that the alderman and member duly elected did not forfeit their offices by their neglect of being sworn in within ten days after their election. The counsel, in my judgment, are right in this construction; the neglect to take the oath of office did not, *ipso facto*, vacate the office.

"The officers elected would have been legally qualified to discharge their duties of office had they been sworn in after the expiration of ten days, but an officer   *   *   *   may resign his office, or he may refuse to act; and, in either case, his office may be declared vacant, and his place supplied. If,

therefore, he is required to take an oath of office, and he declines to do it within the time prescribed by law, while such neglect does not, *ipso facto*, vacate his office, the body, of which he is a member, may declare the office vacant, upon the ground of his refusal or neglect to assume the responsibilities in the mode directed by law." This lucid statement of the law, by that learned court, needs no comment.

In the case of Heath and others, the Supreme Court of New York say: "Nothing is better settled, as a general rule, than that, where a statute requires an act to be done by an officer within a certain time, for a public purpose, the statute shall be taken to be merely directory; and though he neglect his duty, by allowing the time to go by, if he afterwards perform, the public shall not suffer by the delay." *3 Hill, 47;* see, also, *6 Wend., 486.*

In the case before the court, it certainly will not be insisted that the taking of this oath, by the Lieutenant Governor, was an act to be done for a public purpose; and this very learned court say, a neglect of duty in letting the time go by, if he afterwards perform, the public shall not suffer by the delay. And no vacancy is alleged to have occurred, nor injury done, in this instance.

We are clearly of the opinion that qualification and entering upon duty by the Lieutenant Governor, after the expiration of the fifteen days, would entitle him to the office. The schedule, in its whole scope and spirit, is a directory act, and no negative words are used prohibiting the taking of the oath at any time after the fifteen days, and no penalty is affixed for failing to take it within that time.

The taking of the oath was collateral and preliminary to the main object of filling and exercising the functions of the office, and not the essence of holding or doing the duties thereof.

For the same reasons that this demurrer should have been held good, we are of opinion the demurrer to the respondent's second plea should have been overruled.

We also disagree with a majority of the court upon the mo-

tion filed praying for a trial, of the issue of fact herein joined, by a jury.

We regard the right of trial by jury, in actions *at law*, as one of those fundamental principles of liberty that may be claimed by any suitor, when his right of property, liberty or character is put in issue before a court of *law*.

Our Bill of Rights, section 61, declares that "the right of trial by jury shall remain inviolate, and shall extend to all cases at law, without regard to the amount in controversy."

It has been assumed, in argument, that this is a peculiar action, and that, while this court is, by the Constitution, clothed with power to issue this writ, and to hear and determine the same, there is no authority given or mode prescribed by which a jury can be brought into court to try the issue of fact, and that it necessarily follows that the court must determine all questions of both law and fact. This by no means follows. If it be true that this court has jurisdiction to hear and determine this cause, then the ordinary legal means, necessary to ascertain the facts, follow as an incident to such power. See *State v. Morrill, 16 Ark., 384; Fletcher v. Oliver, 25 Ark., 298.*

If, to say no statute has directed how we shall procure a jury, is sufficient to deprive the respondent of a trial by jury, is it not equally forcible to say there is no statute directing in what form process of summons shall be issued, to whom directed, by whom, how and at what time it shall be served, when and in what manner returned? and, therefore, the court cannot take jurisdiction of the respondent and decide his case. Yet, by an appeal to the inherent powers of the court, and its just discretion, we readily formed a writ, quickly decided the sheriff should execute it, and as readily determined how it should be returned, and that, thereby, we had jurisdiction of the respondent and his case.

If this discretion was proper, why cannot the same inherent powers and judicious discretion direct a jury returned to the bar to decide the facts in the cause upon which the court

would determine the rights of the parties? If the latter dis-
cretion and power cannot be exercised, the right to determine
the case should be held in abeyance and await legislative
action. See *38 Mo. (7 Wright) 539.*

But we are of opinion that where the fundamental law
authorizes and empowers a superior court to hear and determ-
ine a cause, the grant carries with it the incidents necessary to
carry out that power, and that the usual modes of trial, as
understood and regulated by the common law, may be adopted
to ascertain the necessary facts in the case; *1 Tenn. 363;* and
that while the court responds to issues of law, a jury should
respond to issues of fact; and if no mode of trial has been pre-
scribed, the common law is in force and should be pursued.

This is said to be unlike an information in the nature of a
*quo warranto,* wherein a party may demand a jury trial.

We are aware that anciently, under the common law, there
were proceedings in the nature of a *quo warranto,* so-called,
prosecuted by the crown officer, upon which the accused, if con-
victed, was subjected to puishment as well as ouster from office.
These were criminal informations or prosecutions, and differed
from the suit by *quo warranto,* which had for its leading
object to determine the respondent's right to the emoluments
and franchises of an office. But the forms and proceedings
by *quo warranto* were so cumbersome and fraught with such
disadvantages that it was abandoned by the English courts as
far back as the date of Queen Anne; and an information in
the nature of *quo warranto,* adopted for the very purpose of
the ancient writ—the trial of the right to an office—and most
of the American States pursue, by statute, a similar remedy
to try the right of a claimant to an office.

Hence, in looking over the precedents of trials, they are gener-
ally upon such informations in the nature of *quo warranto,* but
are, in substance, the same as *quo warranto,* each being for the
distinct purpose of trying the right to an office; and we must
look to the substance of the proceedings, and not to the name
merely. In informations in the nature of *quo warranto,* as

far back as Charles II, and William III., we find the accused had a trial by jury. *King v. Mayor of London, 1 Shower, 254; King v. Carpenter, 2 Shower, 47; King v. Bridge, 1 William Blackstone, 45.*

In the case of the *King v. Francis,* as far back as 1788, an objection was made to granting a new trial on an information in the nature of a *quo warranto.* "The court granted a new trial, saying that of late years a *quo warranto* information had been considered merely in the nature of a civil proceeding, and that there were several instances since the case in Streye, in which a new trial had been granted." *2 Term, 484.*

These cases show that, in the King's Bench of England, these proceedings were considered civil actions, over one hundred years ago, and they were there tried by jury. And Mr. Selwin, in his *Nisi Prius, vol. 2, 1180,* says: "In a *quo warranto* to try defendant's right to be bailiff of Scarborough, in setting out his right, he showed his election," etc., etc., "and it being objected on the trial that this record ought not to be read against the defendant, and the judge having allowed it to be read, and left the whole evidence on both sides to the jury, to consider whether these persons were bailiffs," etc.

This shows, then, a jury trial, not on an information in the nature of *quo warranto,* but upon a writ of *quo warranto.* So, if there was a real difference, it is not shown in the mode of trial.

In Pennsylvania an information in the nature of a *quo warranto,* to test the right of an accused to hold an office, is triable by a jury. *Com. v. Woelper, et al. 3 Serg. & R. 28.*

In the case of the *Commonwealth v. Del. and H. Canal Company,* upon *quo warranto,* the court, in speaking of their statute authorizing special proceedings in that case by *quo warranto,* etc., say: "It is matter of no importance to the parties whether this authority is exercised in the common law or in the equity form, provided the right of trial by jury is not interfered with, as it cannot be in this case." *43 Pa. sec. 300.*

Here this able court recognized the right of trial by jury in

*quo warranto*, as a *common law right*, saying that the State might proceed in the equitable form under their statute, provided the right of trial by jury should not be interfered with, clearly indicating that they recognized no power in the Legislature to deprive the respondent of a jury trial; and how much more should we regard this right when guaranteed by our Constitution and laws.

In the case of the *Commonwealth, ex rel. Jackson v. Smith, 45 Pa. sec. 59*, the Supreme Court say: "This was a proceeding founded on petition of Isaac Jackson, *et al.,* against Smith *et al.,* praying that the process of law be awarded, etc.; that "defendants show by what authority they claim to have, use and exercise the liberties, duties and privileges of said office. On this petition a writ of *quo warranto* issued as prayed for." The defendants, by plea, denied the election of the relators, and claimed that they were duly elected; to which the relators replied that the defendants were not duly elected, and thereupon issue was joined; the case was tried before LOWRIE, J., and resulted in a verdict for relators, etc.

In the case of the *Attorney General, rel., v. Lindsey, 4 George (Miss.) 508*, the court say, that, a *quo warranto* and an information in the nature of a *quo warranto* are the same. Under the modern practice both are but suits at law, to determine a right to office. See, also, *38 Mo. 539.*

In Indiana, in the case of the *Bank of Vincennes v. The State*, in a suit of an information in the nature of *quo warranto*, various issues were made up, and they were submitted to a jury for a trial. This was no proceeding to have the bank convicted, fined or imprisoned, but a civil suit to determine whether or not she, as a corporation, could exercise certain privileges claimed by her, and that learned court treated the verdict as it would in other cases at law; *1 Blackf., 269;* and in the case in *38 Mo.,* referred to, the court refused to allow the case heard before them, because no provision had been made by law for a jury trial. These cases show how other courts proceeded to determine a right to the franchises of an

office; and in cases of this character, where an issue of fact was to be determined by the testimony of witnesses, we have not been able to find any case in which a court, since the beginning of the days of English liberty, upon direct application, refused a litigant the right of trial by jury.

Yet we rest our conclusions not so much upon these rulings, as upon the fundamental maxims of free institutions and popular governments; upon principles recognized as the foundation of civil liberty, and, beyond memory, ingrafted upon the common law of England, and made a part of the frame-work of the original law of the American States, and that of the Union of those States. That venerable author, Sir William Blackstone, in speaking of the value of the trial by jury, says: "In Magna Charta it is more than once insisted on as the principal bulwark of our liberties." *Vol. 2, 350.* Further on he says: "Upon these accounts the trial by jury ever has been, and I trust ever will be, looked upon as the glory of the English law, and it has so great an advantage over others in regulating civil property, how much must that advantage be heightened when it is applied to criminal cases? But this we must refer to the ensuing book of these Commentaries, only observing, for the present, that it is the most transcendent privilege which any subject can enjoy or wish for; that he cannot be affected, either in his property, his liberty or his person, but by the unanimous consent of twelve of his neighbors and equals," * * * "and therefore, a celebrated French writer, who concludes, that because Rome, Sparta and Carthage have lost their liberties, therefore, those of England, in time, must perish, should have recollected that Rome, Sparta and Carthage, at the time when their liberties were lost, were strangers to the trial by jury. * * * It is, therefore, upon the whole, a duty which every man owes to his country, his friends, his posterity and himself, to maintain to the utmost of his power, this valuable constitution in all its rights; * * * *and above all*, to guard with the most jealous circumspection,

the introduction of *new* and *arbitrary* methods *of trial*, which under *a variety of plausible pretences* may, in time, imperceptibly. undermine this best preservative of English liberty."

In conclusion of this question : If this right was not a pillar in the foundation of free government, the declarations in our Constitution, that *"it shall remain inviolate,"* and our statute, that, "All issues of fact joined in any suit at law, in any court of record, shall be tried either by the court, by jury, or by arbitrators ; *First*, the trial shall be by the court, where neither party shall demand a trial by jury; *Second, a trial shall be by jury when either party shall demand such* trial; *Third*, It shall be tried by arbitrators on the agreement of the parties to refer the matter in dispute to arbitrators;" *Gould's Digest, section 99, chapter 133*, would determine our ruling.

No one denies this being *a suit at law, in a court of record;* and there can be no question but the issue is purely *one of fact.* This law says in all such cases, the trial *shall be by jury, where either party demands it.* As no exceptions are made in this law, we are of opinion, a jury trial ought to have been awarded.

The power of this court to exercise original jurisdiction in cases of *quo warranto and mandamus*, is a question not free from difficulty. The various Constitutions of the State, from that of 1836, to the present time, we regard as substantially the same upon this subject.

In the earlier history of the State, the question seemed not to have attracted any marked attention and discussion, and this court assumed jurisdiction, and occasionally the same was exercised, up to the twelfth volume of the Reports, when, in the case of *Allis, ex parte*, a most elaborate consideration of the subject was had, and it was determined that such writs should be issued by this court, only in the exercise of its appellate powers, or superintending control over inferior tribunals, when such interposition was necessary to prevent a failure of justice; and that ruling was the settled law of this court up to the twenty-fifth volume of Reports. See, *Marr, ex parte, 12*

*Ark. 84; Allis, ex parte, 12 Ark. 102; Crise, ex parte, 16 ib.,* *195; Goad, ex parte, ib. 411; Jones v. City of Little Rock, 25* *Ark. 287.*

We concur in the doctrine announced in those cases.

The opinion, by our Chief Justice this morning referred to, in the so-called Confederate court, of ·the State against Williams, is, by us, regarded of less weight than most learned opinions—not from a want of ability on the part of the distinguished gentlemen who are said to have presided over that tribunal, but from the occasion and circumstances that produced what is said to have been their opinion. There was certainly a want of that calm reflection necessary to a judicious opinion upon important questions of constitutional law. We need not resort to our knowledge of that intense prejudice and excitement, seen only in the last convulsions ,of a desperate war, and which challenge the reason of great as well as smaller minds. But the opinion, upon its face, shows that it was brought forth under a terrible military rule; and that the court's own existence, if not destroyed, was seriously questioned by the war power under which it existed; and the authority it assumed to represent, had dominion over but a small part of the State.

What purports to be their opinion, sets out by declaring that' they will only assume jurisdiction in a case "involving the· civil rights of the State as sovereign, affecting vitally its char-- acter, and the proper administration of the government." These writs, not be issued at the suit of individuals, but only as the State, by her attorney general, may ask; yet, the very case then before them was at the instance of one claiming to be a temporary attorney general, and against the acknowledged attorney general of the State, and the court assumed jurisdiction over the person of the accused, when, according to their own records, he was residing in and protected by a hostile government. With this stretch of jurisdiction, and the language of the Judge who wrote the opinion, pouring out such a mass. of bitter invectives against the lawful government, and heap--

ing like abuse upon a late Confederate for laying down arms, (an example that he himself soon followed), shows conclusively to us a want of such frame of mind as renders opinions profound and authoritative; and had that gentleman then been holding a valid court, he should have shown more of deliberate judgment, and less of passion, than appears in the pamphlet presented us, before we could have recognized his *ipse dixit* as weighty authority.

The importance of having a court of appeals, a court for the correction of errors, situate remote from the excitement and passions that so often attend original trials, certainly was anticipated by the framers of our system of laws, and we think the whole theory of our jurisprudence is a cogent argument against the exercise of original jurisdiction by this court. And we regret that our state of health, since this trial began, has prevented us from elaborating this subject.

We concur in the finding of the court, on the facts of the case.