The State, ex rel. Valentine, v. Griffey.

STATE OF NEBRASKA, EX REL. E. K. VALENTINE, v. THOMAS L. GRIFFEY.

| 5 | 161 |
|---|---|
| 13 | 581 |
| 5 | 161 |
| 29 | 345 |
| 5 | 161 |
| 44 | 86 |

1. **Election**: DESIGNATION OF OFFICE ON BALLOTS. A ballot voted at a legal election without any designation of an office, and also a ballot voted with two or more names on it, when the tenure of the office is limited to one person only, are illegal and void.

2. ———: EVIDENCE TO CORRECT MISTAKE IN CANVASS OF VOTE. Extrinsic evidence of a public nature, including the circumstances surrounding an election, may be received in evidence to correct a mistake in the return of the canvassers of the vote, in respect to the designation of an office voted for at such election; and such evidence is applied according to the rules of law in relation to mistakes in other writings.

3. ———: ILLEGAL VOTES. Under the facts stated in this case, *held* that certain persons residing in unorganized counties, illegally voted in adjoining organized counties.

VOL. V—11

4. ———: U. S. MILITARY POST. The military post in Valley county is not a military reservation reserved by the United States on the admission of Nebraska as a state, nor as land ceded by the state to the United States since its admission, but is a part of and subject to the operation of the laws of the state; and persons who with their families removed to the post *sine animo revertendi,* became residents of the county, and were entitled to the right of suffrage therein.

THIS was an information in the nature of a *quo warranto,* brought in this court in the exercise of its original jurisdiction. Apart from the facts necessary to an understanding of the case, which are stated in the opinion, it may be added that the district in which this contest arose comprises fourteen counties, lying in the northern and northeastern portion of the state, adjacent to which on the west lies the county of Holt, as yet unorganized, ·and a portion of territory familiarly known as Taylor county, but not yet so designated by the legislature. Holt county lies adjacent to Knox, and at the election held in October, 1875, twenty-five residents thereof voted in various precincts of the latter county; and in precinct No. 5 of Valley county nine persons voted who were residents of the territory known as Taylor county. Including these nine votes, there were cast sixty votes in that precinct, fifty-one of which were for Valentine and nine for Griffey, all of which were omitted in the return of the county clerk to the state canvassing board. Fort Hartsuff is a military post of the United States situated in that precinct, and eleven persons living there voted at the election.    A stipulation was filed setting forth the names of these persons; and the facts relative to the votes from Holt county which were polled in Knox, and those from Taylor county which were polled in Valley, were agreed upon as above stated. These being held illegal, as well as three of the votes from Fort Hartsuff, and a deduction being made from the vote of each party *pro rata,* according to the general result in each precinct

where the votes were cast, the general result was reached as follows:

### VALENTINE.

Vote omitted in return of precinct No. 5, Valley county ..................................... 51

*Deductions:*

Pro rata of illegal vote from Taylor
county........................... 7.65

Pro rata of illegal vote from military
post............................. 2.55

Pro rata of illegal vote from Holt county   4.00—14.20

    Total............................. 36.80

### GRIFFEY.

Majority as returned by state board........... 61

*Additions:*

Votes omitted in precinct No. 2, Cedar county,   9
  "    "    "    "    " 5, Valley  "  9
  " not counted in precinct No. 6, Cedar "   20

                               99

*Deductions:*

Illegal votes in Cedar county......... 63

Pro rata of illegal vote from Taylor
county........................... 1.35

Pro rata of illegal vote from military
post............................. .45—64.80

    Total ............................. 34.20

    Majority for Valentine .............. 2.60

*John C. Cowin,* for the relator.

*E. Wakeley* and *George W. Doane,* for the respondent, cited *People v. Ferguson,* 8 Cow., 102. *People v. Cook,*

4 Seld., 67.    *People v. Eastman*, 5 Den., 409.    *People v. McManus*, 34 Barb., 620.    *Carpenter v. Ely*, 4 Wis., 420.    *State v. Cogswell*, 8 Ohio State, 620.    *People v. Matteson*, 17 Ill., 167.    *State v. Elwood*, 12 Wis., 551. *State v. Cavers*, 22 Iowa, 343.    American Law of Elections, 207.

GANTT, J.

The relator has filed in this court an information in the nature of a *quo warranto* (the district attorney and attorney general having refused to do so), and he alleges that the defendant hath held, used and exercised, and doth still hold, use and exercise, the office of judge of the sixth judicial district, without any legal election, appointment, warrant or authority whatever, therefor, and that he is unlawfully holding and exercising the said office, and has usurped and invaded the same.    Specific allegations in regard to the conduct of the election, and the canvass of the vote, in the said district, are set forth in the information, but it is not deemed necessary to notice them here in detail.    The defendant denies the material allegations in the information, and also sets forth in his answer specific allegations in regard to the conduct and canvass of the election in said district.    It appears that at an election held on the 12th day of October, 1875, for judges of the supreme court, and district courts of the state, the relator and defendant were opposing candidates, and the only candidates for election to the office of judge, for the sixth judicial district of the state; and the main question raised by the pleadings in this action is, which one, if either, of these two parties was legally elected to the office of judge of the said judicial district?

By the stipulations and agreement of the parties, the points of controversy between them have been narrowed down to a few questions only, for the court to determine,

and we will at once proceed to the examination of these questions.

I.  In Cedar county, it being one of the counties composing the sixth judicial district, sixty-three tickets were voted in the form following:

"District Ticket of the Sixth Judicial District.

T. L. Griffey, of Dakota County.

George B. Fletcher, of Madison County."

These tickets were counted by the board of canvassers, as votes cast for the defendant, and were so returned for him.  The relator insists that all these ballots are defective, illegal and void, and should not have been received and counted for the defendant for the reasons:

*First.* That there is no designation of any office on the ballots, and

*Second.* That they contain the names of two persons, whereas, the tenure of office is limited to one person, only.

The defendant, however, contends that as he was a candidate for the office of judge, and G. B. Fletcher was a candidate for the office of district attorney for the sixth judicial district, and as the ballots are designated: "District ticket of the sixth judicial district," and as there was no other candidate for the same office, of a name similar to his, the ballots sufficiently indicate that the electors intended to and did vote for him for the office of judge of the said judicial district, and, therefore, he is entitled to the benefit of all these sixty-three votes.

The facts in proof show that there was no other candidate for the office, of the same name of the defendant; that it was generally understood in the district that the defendant was a candidate for this office, and also that G. B. Fletcher was a candidate for the office of district attorney for the same judicial district.

But, whatever may be the proof in relation to candi-

dates for one or another office in the judicial district, we think the position taken by the defendant in respect to these ballots, cannot be sustained upon either law or sound policy.    Upon inspection it is very evident that no office whatever is designated on the face of these ballots, and the proposition will hardly be questioned, that some designation of office stated on the ballot, is one of the essential properties to constitute it a legal ballot. Without some designation of office the ballot would be meaningless, and it would be impossible for the officers of the election to determine for what office the persons named on it were intended.    But it is not essential that the ballot should with technical accuracy designate the office.    This is not an indispensable requirement of the law, and, therefore, in case the office should be imperfectly or in part mistakenly designated, then, under the application of the common sense rules which are applied in other cases of defective writings, if the proofs of circumstances surrounding the election will reasonably explain the ballot and correct the mistake or defect, it may be sustained and effect be given to the intention of the voter.    But in the case under consideration, as no office at all is designated, there is nothing to explain, and no defect or mistake to correct.

Again, each one of these ballots contains the names of two persons, and as this is a greater number than is required to fill the office, it is fatal to the validity of the ballots.    The act entitled "an act to provide a general election law," in section thirteen, provides that "whenever a ballot shall contain a greater number of names for any one office than the number of persons required to fill that office, it shall be deemed fraudulent as to the whole of the names for that office."

This statutory law seems to be conclusive in regard to such a ballot.    It *shall* be deemed fraudulent as to all the names on it.    The law is mandatory.    But it seems

only to be declaratory of the common law rule in respect to such ballots. In Cooley on Const. Lim., 607, it is said that "the ballot in no case should contain more names than are authorized to be voted for, for any particular office at that election, and if it should, it must be rejected," and then gives the reasons for its rejection. *Carpenter v. Ely*, 4 Wis., 426.

We have not been able to find one authority which sustains the position taken by the defendant in regard to these sixty-three ballots; hence, both upon the common law rule and the statutory requirement these votes must be rejected.

II. In the election returns from precinct No. 6, in Cedar county, twenty ballots voted for the defendant, being the whole number of votes cast in that precinct, are returned as follows: "County Judge, T. L. Griffey, of Dakota county, 11111111111111111111—20," and the county board of canvassers excluded all these votes from the count of votes for him for judge of the judicial district.

He claims that he is legally entitled to the benefit of these votes, and of right they ought to be counted for him for judge of the district court. It appears from the evidence that the ballots of this precinct as well as of all the other precincts in the county were not deposited in the office of the county clerk, and that some time after the election the ballots of precinct No. 6 were destroyed.

The defendant, therefore, introduced evidence, substantially, showing that no other person of his name was a candidate for the same office or for the office of county judge in Cedar county; that he was generally known in Cedar county, and that it was generally understood in said county that he was a candidate for the office of judge of the district court; that he was known by and was acquainted with a large number of the people of said county, and that he was not a resident of Cedar county,

and that at the time of the election and for many years prior thereto, he was a resident of Dakota county, one of the counties composing the said 6th judicial district. And A. Buchelman testified, substantially, that he is a resident of the said precinct No. 6; that he was at the election in said precinct, on the 12th day of October last; that he knew Griffey and Valentine were candidates for the office of district judge;' that before they commenced voting, he and some others found some of the tickets were not right, and they laid them aside; that before they commenced voting, it was generally understood and discussed by the voters there, that Griffey and Valentine were the candidates for the office of judge of the 6th judicial district. The return above quoted shows that an office is designated, but it is not that of district judge. Hence, the question is: Is it the particular office of judge the defendant was voted for by the electors of this precinct? If it is not, and a mistake has occurred in the title in the return itself, can such mistake be corrected by extrinsic evidence of a public nature, including the circumstances surrounding the election?

It seems to be generally held that an elector cannot be received as a witness to make good an ambiguous ballot by testifying for whom and for what office he intended to vote; but in the case at bar the evidence is not offered to make good an ambiguous ballot, or even to explain an imperfect one, but it is for the purpose of explaining and correcting a mistake in the title of office in the returns of the election officers, and to give effect to the intention of the elector as manifested by the ballot. The doctrine seems to be well settled that extrinsic evidence may be received to help out the imperfections of a ballot. Why should it not, with greater propriety and justice, be received for the purpose of correcting a mistake in the return of the election officers, which, if not corrected, would thwart the will and nullify all the votes

of the voters of an election? We think the evidence is properly admissible, and may be applied according to the rules of law in relation to the correction of mistakes in other writings. In *The State, ex rel. Spaulding, v. Elwood*, 12 Wis., 557, it is said to be a well settled doctrine of the court that "in a contest between individuals as to the right to an office, it will go back and rectify any omission or mistake of the canvassing board and give effect to the real will of the elector as expressed through his ballot;" and it is further held, as a doctrine not to be controverted, that in such cases, facts and circumstances of a public nature, connected with the election may be resorted to for the purpose of ascertaining the intention of the elector, and the question must be determined in the light of such surrounding circumstances. Cooley on Con. Lim., 611. *Carpenter v. Ely*, 4 Wis., 426.

The evidence shows that the defendant was generally known in the county, that it was generally understood he was the only candidate of his name for the office of district judge, that he was not a resident of the county, but was a resident of Dakota county, and, therefore, was not eligible for the office of county judge of Cedar county, and that before the voting commenced in precinct No. 6, it was generally understood and discussed by the voters that defendant and relator were the opposing candidates for judge of the judicial district. And upon inspection of the poll books, it is proved that one list contains the "title of office" and "names of persons voted for," for the several county offices, and in this list is the office of probate judge, to which E. E. Otis was elected; another list, which evidently was prepared by some other person for the board, contains, conveniently arranged, the title of office for "judge of supreme court," "judge of the 6th judicial district," "prosecuting attorney, 6th judicial district," and "county judge." The title "judge of 6th judicial district," has an ink

line drawn over it, and without any other title named the names of the candidates for university regents are inserted immediately under this title, and the name of "T. L. Griffey, of Dakota county," is inserted under the title of "county judge." The conclusion is reasonable, and seems evident on inspection, that the person who prepared the list overlooked the office of university regents, and that the election officers having inserted the names of candidates for this office under that of judge of the 6th judicial district, erased the latter without naming that of the former, and then inserted the name of defendant under the title of county judge without changing it to district judge. From the evidence and inspection of the poll books, we think that the twenty votes were cast for defendant for the office of judge of the judicial district, and, therefore, they should be counted for him for that office. *State ex rel. Phelps v. Goldthwaite*, 16 Wis., 149. *People v. McManus*, 34 Barb., 626. *People ex rel. Aikin v. Matteson*, 17 Ill., 163.

III. It is admitted that a number of persons residing in unorganized counties, voted, some in Knox and some in Valley county. The legality of these votes is submitted to the court, and if it shall be determined they are illegal votes, then it is agreed that these votes shall be proportionately deducted from the vote of each party, according to the general result in each precinct where the votes were cast. The statement of facts in respect to these votes is very meagre, and from what is stated, without intimating any opinion in regard to the proper mode and place of voting by persons residing in unorganized counties, attached to organized counties for election, judicial and revenue purposes, we must conclude that these votes were illegally cast, nine in Valley county

and twenty-five in Knox county, and must be deducted in the manner suggested.

It is also admitted that eleven persons, employed at the military post in precinct No. 5, in Valley county, voted at the election in said precinct. The post is located on two sections of land in the precinct, which were withdrawn from sale by the government. From the facts stated it seems to be simply a post for temporary purposes, and not a military reservation, reserved by the United States on the admission of Nebraska as a state, or land ceded by Nebraska to the United States since the state was admitted, and, therefore, it is a part of and subject generally to the operation of the laws of the state. Again, it will not be contended that persons in the employ of the general government, and not in the regular army, shall for that reason be deprived of their votes, if they otherwise possess the statutory qualifications of electors. Then, were these persons, or any of them, such residents of the precinct as would give them the legal right of voting at the election? It is only upon the law and the facts as stated in the stipulation of the parties that the question must be determined. The statement of facts shows that E. S. Pierson came to the post in September, 1874, and brought his wife in the following spring; they resided all the time at the post, and he " did not change his residence for four or five months after he quit work." If his domicil was not at the post, how could he change his residence? But where did he go? It is not stated that he left the precinct.

H. F. Morton came to the post in the fall of 1874 with his family, and resided at the post; he " was a *resident* six or seven months after he quit work on the post," and did other work in the precinct and remained until late in the summer of 1876. Did he leave the precinct? It is not so stated.

C. C. Cheesebro was a resident of the precinct before

work was commenced on the post, and moved his family to the post in the spring of 1875; he worked there until the work was done in the spring of 1876, and, from all that appears, he still resides there.

F. O. Graham was superintendent of the works at the post; he came with his family, who still reside at the post; he has a "claim" in the precinct, which he has improved, but never lived on the same; he remained until the work was finished, and he is now supposed to be in the Black Hills. There is no fact stated tending to show that his residence has been changed since he settled with his family at the post.

John Peterson came some months after the work commenced, and was foreman of the carpenters till four or five months ago, when he left. It is not stated that he left the precinct.

James Jansen was an employe at the post all the time, and left when the work was finished. It is not said that he left the precinct.

John Greenfield worked all the time, commenced with the building of the post, and left when done; had his family. It does not appear that he left the precinct.

N. C. Barlow commenced in February, 1875, to work; left when work was done; went to Howard county and took up a claim; had no family. Was he a resident of the precinct before he worked at the post? It cannot be presumed he was not.

It may be noticed as a fact patent to all that in a new country, a man who depends upon his work as a laborer or mechanic often changes his residence *sine animo revertendi*, in order to live at the place of his employment. But, however this may be, there is no fact stated tending to show that the removal of any one of these persons, with his family, to the post, in the precinct, was with the intention to return to the place whence he came. And it is said that a man can only have one domicil at the same

time, and every man must have a domicil somewhere. "A person being at a place is *prima facie* evidence that he is domiciled there, but it may be explained and the presumption may be rebutted." 2 Kent Com., 430, note. *Putnam v. Johnson*, 10 Mass., 501. It seems clear from the facts stated, and the law, that the above named persons were entitled to the right of suffrage at the election in the precinct, being residents therein.

But we are of the opinion that the three remaining persons, named in the stipulation, did not possess the statutory qualifications of electors in the precinct, and their votes must be rejected.

It is admitted that relator received fifty-one votes, and that defendant received nine votes in precinct No. 5, in Valley county, which were omitted in the canvass and return of the votes, including the vote of persons at the post, and that they ought to be counted, except such as may be, if any, adjudged illegal of those who were at the post; and it is further admitted that in precinct No. 2, in Cedar county, "in carrying out the number of votes for T. L. Griffey of votes cast for him as shown by the tallies on the poll books as sixty-seven votes, there was a mistake as the same makes seventy-six votes for him," and therefore nine votes should be added to those of defendant in the count.

In conclusion it only remains to say that upon a count of the votes of the judicial district, according to the law as held in this opinion, we find that the relator had a majority of all the legal votes cast in the sixth judicial district, and is therefore entitled to the office of judge of said judicial district, and therefore judgment of ouster must be rendered against the defendant.

JUDGMENT ACCORDINGLY.