## STATE *ex rel* D. S. MOORE *vs.* O. W. ARCHIBALD.

Opinion filed February 20th, 1896.

### Original Jurisdiction of Supreme Court in Mandamus.

This court has original jurisdiction in cases in which the writs named in the constitution may be employed to initiate such jurisdiction. But that jurisdiction is limited to cases involving the sovereignty of the state, its perogatives or franchises, or the liberty of the citizen; this court judging for itself in each case whether that particular case is within its jurisdiction.

### Trustees of Hospital for Insane—Removal of Superintendent.

The state.hospital for the insane is by law under the general management and control of a board of five trustees, which has power to appoint the superintendent of such hospital and remove him at pleasure. The defendant having been removed by the board from the office of superintendent, and the relator having been appointed by the board to fill such office in his place, *held* that, in mandamus proceedings to compel the defendant to turn over to the relator such office, the sovereignty of the state was involved, in a direct and important sense, the right of the board of trustees to control and manage a great state institution being necessarily involved, and that therefore this court held original jurisdiction of such proceedings.

### Remedy by Mandamus.

Mandamus is the proper remedy to compel one who has no color of title to an office to surrender it to one who holds the *prima facie* title to it.

### Power to Appoint, Carries Power of Removal.

The grant of power to appoint to public office, where no term of office is fixed by law, carries with it as an incident the absolute power of removal at any time, without notice or charges or a hearing, and without the cause for removal being inquired into by any court. Such power vested in a board cannot be limited by any action taken by such board, whether by appointing the officer for a fixed term, or by by-laws restricting the power of removal to cases where cause for removal exists.

### Majority Vote of Trustees Effectual to Remove Superintendent.

A motion to remove the defendant having been made and seconded at a meeting of the board at which all the members were present, the chairman of the meeting refused to put the motion, on the ground that it was illegal. Thereupon it was put by the trustee who made the motion, and received the vote of three of the five members, the other two trustees refusing to vote. *Held*, that these proceedings were effectual to remove the defendant.

### Appointment of Superintendent.

Also, *held*, that the relator was legally appointed to the office, the same proceedings being had on the motion that he be appointed.

**Approval of Bond.**

> Also, *held*, that the approval of his bond by the board was established by showing that the same proceedings were had on the motion to approve it.

**Constitution Does Not Impair Power of Trustees to Remove.**

> The fact that the superintendent may be removed from office for the causes mentioned in section 197 of the constitution (assuming this to be the case) does not impair the power of the board to remove him at pleasure.

Original application on the relation of Dwight S. Moore against O. Wellington Archibald for a writ of mandamus.

Peremptory writ awarded.

*Edgar W. Camp* and *Glaspell & Ellsworth*, for petitioner.

*F. Baldwin* and *Newman, Spalding & Phelps*, in opposition.

CORLISS, J. Application is made to this court to put forth its original jurisdiction by issuing the writ of mandamus to compel the defendant to turn over to the relator the possession of the office of superintendent of the State Hospital for the Insane. The defendant was appointed to such office by the trustees of that institution (which, for convenience, will be designated in this opinion as the "asylum") on the————day of January, 1896; and before the time (one year) for which defendant was appointed had expired, he was removed from such office by a majority vote of the board of trustees, at a meeting called for that purpose, and at which all of the trustees were present; and by the same vote the relator was appointed superintendent in his place.

At the outset, this court is called upon to determine the question of its original jurisdiction in issuing the perogative writs named in the constitution, and the scope of that jurisdiction if such jurisdiction exists. The task is at once delicate and difficult. We are to trace the line that marks the boundary of our power, as the people have drawn it in the organic law, careful not to usurp unwarranted jurisdiction, and yet as careful not to withhold the exercise of jurisdiction conferred. That we have power to issue these original writs in some cases, not merely in aid of jurisdiction, but to found jurisdiction, we entertain no doubt. We so held in *State* v. *Nelson Co.*, 1 N. D. 88-101, 45 N.

W. 33; and while the question was not discussed by counsel in that case, it was thoroughly gone into by this court, and the conclusion there reached was the result of a careful examination of the same arguments and cases which have been presented in this cause. However, while we feel bound by that decision, we would reach the same conclusion were the question open to debate. The grant of power to issue the specified writs to initiate jurisdiction, at least in some exigencies, is quite apparent.

The constitution, so far as it relates to this subject, provides as follows:

"Sec. 86. The Supreme Court, except as otherwise provided in this constitution, shall have appellate jurisdiction only, which shall be co-extensive with the state and shall have a general superintending control over all inferior courts under such regulations and limitations as may be prescribed by law.

"Sec. 87. It shall have power to issue writs of *habeas corpus*, *mandamus*, *quo warranto*, *certiorari*, *injunction*, and such other original and remedial writs as may be necessary to the proper exercise of its jurisdiction, and shall have authority to hear and determine the same; provided, however, that no jury trials shall be allowed in said Supreme Court, but in proper cases questions of fact may be sent by said court to a District Court for trial."

These provisions, as we construe them, vest in this court—First, appellate jurisdiction; second, general superintending control over inferior courts; third, power to issue the writs specified, not only in furtherance of other jurisdiction, but also in the exercise of origninal jurisdiction; fourth, authority to issue such other original and remedial writs as may be necessary to the proper exercise of the jurisdiction vested in this court. This last grant was unnecessary, as we shall see, and was doubtless inserted for greater certainty. These ancillary writs are to be employed in furtherance of any jurisdiction possessed by this court, whether appellate, original, or superintending. If the writs specifically named are not to be issued by this court in the exercise of original jurisdiction, then two of them cannot be issued by this

court at all, as two of them are not such writs as can be employed in aid of either the appellate jurisdiction or the power of superintending control conferred upon this court. This fact is fatal to the construction that the writs specified, as well as those included in the clause, "such other and remedial writs," etc., are to be resorted to only as the means of carrying into effect the appellate and superintending powers of this court. The writs particularly named constitute a class by themselves, and are to be issued independently of any other jurisdiction possessed by the court. It is true that some of them may be issued in aid of the other jurisdiction vested in this court. The other and unenumerated writs belong to a separate class, being only such writs as are necessary to be used in the aid of jurisdiction, and these are to be employed by this court solely for that purpose. They are instrumentalities which this court would have had power to use for such purpose had the constitution been silent on the subject. The grant of appellate jurisdiction, and of the power of superintending control, carries with it all writs necessary to the proper exercise of such jurisdiction and of such power. *Attorney General* v. *Chicago & N. W. R. Co.*, 35 Wis. 425-515; *Marbury* v. *Madison*, 1 Cranch, 137; *Wheeler* v. *Irrigation Co.*, 9 Colo. 248, 11 Pac. 103. Said Ryan, C. J., in *Attorney General* v. *Chicago & N. W. R. Co.*: "The framers of the constitution appear to have well understood that with appellate jurisdiction the court took all common-law writs applicable to it, and with superintending control all common-law writs applicable to that; and that failing adequate common-law writs, the court might well devise new ones, as Lord Coke tells us, 'as a secret in law.'"

As among the writs specified there are two which cannot be used in aid of either appellate jurisdiction or superintending control, it is demonstrated that the use of the writs particularly specified was not to be restricted, but that they were to be used for all purposes,—as well to take original cognizance of a case as to aid and effectuate other jurisdiction. In *U. S.* v. *Commissioners of Dubuque Co.*, 1 Morris (Iowa) 42-50, this position was recog-

nized as sound. "The fact that the writ of *quo warranto* is mentioned (and perhaps some others,) which could only be issued in the exercise of original power, negatives the idea that these writs are only to serve as auxiliaries in the exercise of appellate jurisdiction." Other courts have considered this point as cogent in favor of original jurisdiction. *Attorney General* v. *Blossom*, 1 Wis. 317-327 (top paging, 277-287;) *Wheeler* v. *Irrigation Co.*, 9 Colo. 248, 11 Pac. 103. Said Justice Smith, in *Attorney General* v. *Blossom*: "Under whatever aspect this court can view this clause of the third section, we are unable to harmonize the nature and office of the class of writs therein named with an intention on the part of the authors of them to render them merely ancillary to the exercise of a power of superintending control over inferior courts lawfully established, or to provide them as mere instrumentalities of appellate jurisdiction." If, bound together with other writs which can be used either to initiate jurisdiction or make effectual other jurisdiction, there were found only a single writ, which could be issued for only the former purpose, this would give character to all the rest. But, as a matter of fact, two such writs are there found,—injunction and *quo warranto*. The grant is unquestionably two-fold with respect to the writs named, which can be used for both purposes. This court is thereby authorized to use them for either purpose,—to found jurisdiction, or in aid of jurisdiction. The writs of *habeas corpus* and mandamus belong to this class, while the writ of *quo warranto*, and also the writ of injunction, as used in the Supreme Court, can be employed only to bring the cause into court in the first instance. While the writ of injunction is not an original, but merely a remedial, writ, so far as courts of inferior jurisdiction are concerned, yet, since the decision in *Attorney General* v. *Chicago & N. W. R. Co.*, 35 Wis. 426-522, that writ has become, with respect to its use in the Supreme Court, a *quasi* perogative or original writ. And it was doubtless in this sense that it was employed when inserted in the constitution. It certainly is never used in aid of either appellate jurisdiction or superintending

control. We find, therefore, in the constitution, two writs exclusively original in their character, in the position in which they are placed. They were placed there to give this court original jurisdiction, if for any purpose whatever; and we cannot, in effect, expunge them from the constitution by construction. Shall we, then, draw the line at these two writs, and say that this court has not original jurisdiction of the other specified writs with which these two are classed? Such arbitrary separation of the specified writs would be unjustifiable. The clause, "such other original and remedial writs as may be necessary to the proper exercise of its jurisdiction," shows that the writs specified shall, so far as they can be issued in furtherance of jurisdiction conferred, be used for that purpose; while, on the other hand, the fact that two of the writs named can be employed only to initiate jurisdiction, and never in aid of appellate jurisdiction or superintending control, shows, with equal force, that such other of the writs specified as can be used as original writs may be issued by this court to found jurisdiction, as well as for other purposes. To the argument that the words, "such other original and remedial writs as shall be necessary to the proper exercise of its jurisdiction," indicate that all the writs named were to be used only in aid of jurisdiction previously conferred, it is a complete answer, as we have already seen, that as to two of these writs the language can have no such significance, because their very nature forbids—renders impossible —such a construction. Why should it have such significance as to the balance of the writs specified, when the other interpretation begets harmony, gives full force to all the language used, and yet does violence to none.

There is no force in the position that the words "original jurisdiction" are not used in connection with the grant of power to issue the writs named. It would not have been proper to have thus restricted the scope of the specified writs. The use of these writs in aid of other jurisdiction could not be founded on the clause, "such other original and remedial writs," etc. This grant is expressly limited to writs other than those named. Unless the

power to employ the specified writs in furtherance of jurisdiction was elsewhere conferred, it might be urged that it did not exist, —that the power had been taken from the court by implication. Certainly, this would be the case if the use of the writs named were restricted to original jurisdiction of them. The silence of the constitution is therefore very significant. It carries, to our mind, the conviction that the writs named were to be used in all proper cases,—as well in furtherance of jurisdiction as to initiate it. The power to issue them was granted in unqualified terms, so that they could be used in aid of superintending control and of appellate jurisdiction, as well as in the exercise of original jurisdiction. The constitution refers to two classes of writs, distinct each from the other with respect to the purposes for which they may be sent forth from this court. With respect to the writs named, the power of the court is unrestricted. They summon parties to its bar of justice in the exercise of original jurisdiction. They also supplement and make efficacious its other powers; while, on the other hand, the authority of this court to issue the unnamed writs rests upon their being necessary to the proper exercise of jurisdiction conferred upon this court.

We find that the separation of these two classes of writs is none the less distinct because the conjunction "and" is not found between the last two of the specified writs, as well as between the last of them and the succeeding clause. This consideration appears to have influenced the decisions in Alabama and Florida. *Ex parte Simonton*, 9 Port. (Ala.) 383; *Ex parte Mansony*, 1 Ala. 98; *Ex parte Henderson*, 43 Ala. 392; *Ex parte Croom*, 19 Ala. 561; *Ex parte White*, 4 Fla. 165. We cannot concur in the reasoning of these cases; and although the constitutions of those states, construed in those cases, were somewhat different from the constitution of this state, yet, if this difference can be said to be sufficient to affect the force of those cases as authorities against our construction, we feel compelled to say that we do not regard them as sound, and cannot follow them. That original jurisdiction was intended to be conferred is inevitable from the opening sentence

of section 86. "The Supreme Court except as otherwise provided in this constitution shall have appellate jurisdiction only." This clearly contemplates a grant of original jurisdiction of some kind to follow. When we find in the next section a grant of power to issue original writs, which can be construed as a grant of power to take original jurisdiction of them,—and can be construed in no other way with respect to two of such writs, *i. e.* injunction and *quo warranto*,—to what conclusion are we impelled? It is to just such jurisdiction that the exception refers; otherwise, it cannot refer to anything. And shall we disregard these words "except as otherwise provided in this constitution"? May we expunge them from the instrument by construction? What rule more elementary or reasonable than that which commands us to give every word in statute or constitution at least some significance, if possible? This view is supported by *Wheeler* v. *Irrigation Co.*, 9 Colo. 248, 11 Pac. 103, where the court say, in answer to the claim that the court possessed no original jurisdiction of prerogative writs: "This position we consider untenable for the following reasons: First, section 2 itself, by the declaration 'except as otherwise provided in this constitution,' implies the conferring of some independent original jurisdiction." In Florida and Alabama, this clause was, without warrant from principle, torn from the constitution by interpretation. See cases already cited. In Iowa, on the contrary, the Supreme Court decided in favor of original jurisdiction, without the presence of such a clause in the constitution, the grant being, expressly of appellate jurisdiction only. *U. S.* v. *Commissioners of Dubuque Co.*, 1 Morris (Iowa) 42. Yet, as the constitution gave the court also power to issue certain specified writs, and all other writs necessary to the administration of justice, the court held that this was a grant of original jurisdiction, where necessary to be exercised by the court, notwithstanding the prior restriction of the power of the court to "appellate jurisdiction only." Therefore the court in that case inserted, by construction, an exception as to other jurisdiction than appellate jurisdiction only, to harmonize the two

provisions. We are not called upon to insert, but merely to see, read, and give effect to such an exception already found in the constitution.

Nor is there any force in the position that the words, "except as otherwise provided in this constitution," were inserted for an abundance of caution. It is not customary, in framing constitutions, to scatter throughout its length provisions relating to the jurisdiction of courts, They are invariably collected in a few consecutive sections. In our constitution, all the provisions relating to the jurisdiction of the Supreme Court are found in two short sections, the one immediately following the other. The words enacted could not, therefore, have been inserted to save a possible clash of provisions because of an inconsistent provision in some unknown part of the instrument, but to prevent the word "only" conflicting with a further grant of power in these sections. In which section is this additional grant of power found? It is found in both. In section 86 there is a grant of superintending control. In section 87 there is a further grant of jurisdiction to issue the writs named, in the exercise of original jurisdiction. The language of the exception is significant. It is, "except as otherwise provided in this constitution," and not, "except as otherwise provided in this section." If the purpose had been to grant only superintending control, in addition to appellate jurisdiction, the language would have been "except as otherwise provided in this section;" for such section contains the express grant of the power of superintending control. There was no occasion to send the mind to look elsewhere for the satisfaction of this exception, if it was satisfied by the grant of the power of superintending control in the very section containing the exception. But the language used is of such a character as to prepare the mind for the discovery of a further grant of power in some other section. This expectation is not disappointed, if we hold, as the very nature of two of the specified writs compels us to hold, that there is in the next section a grant of original jurisdiction in those cases in which

such writs can be used to bring a cause into court for the first time. If the sole purpose of section 87 was to give this court power to issue writs in aid of appellate jurisdiction and superintending control, why should any writs have been therein named? It was not necessary to name them for the purpose of showing what kind of writs should be issued for that purpose; for the very nature of the functions they would perform, on that theory of the object of section 87, would determine what writs could be employed. The section would have read, "It shall have power to issue such writs as may be necessary to the proper exercise of its jurisdiction." But five writs are named, and we must assume it possible that they were named for a purpose. By naming them, they were set apart in a class by themselves, to be used, so far as they could be used for that purpose, in the exercise of original jurisdiction. This is apparent, both because two of them can be issued for no other purpose, and also because in this way only can they be given a function different from the unnamed writs. The cases in Missouri, Wisconsin, Arkansas, and Colorado cannot be said to be conclusive authorities in favor of our construction. The grant of power in those states was to issued certain named writs, and other original and remedial writs, without anything added tending to qualify the purposes for which the writs should be issued, as in the case of our constitution which gives the power to issue the named writs, and such other writs "as may be necessary to the proper exercise of its jurisdiction." It could not be said in those cases, as it can be urged in this, with some plausability that all the writs—as well those specified as those not enumerated—are to issue only in aid of jurisdiction; that the qualifying clause refers to the specified writs as well as to the unnamed writs. Were this qualifying clause eliminated from our constitution, there would be nothing on which to hang a doubt. Still, these cases are not against our position, and some of the reasoning in the opinions supports it. See *Wheeler* v. *Irrigation Co.*, 9 Colo. 248, 11 Pac. 103; *Attorney General* v. *Blossom*, 1 Wis. 277; *Attorney General* v.

*Chicago & N. W. R. Co.*, 35 Wis. 425; *State* v. *Lawrence*, 38 Mo. 535; *State* v. *Vail*, 53 Mo. 97; *State* v. *Stewart*, 32 Mo. 382; *Vail* v. *Dinning*, 44 Mo. 210; *Price* v. *Page*, 25 Ark. 527; *State* v. *Johnson*, 26 Ark. 281. See, also, *State* v. *Griffey*, 5 Neb. 161; *State* v. *Stein*, 13 Neb. 529, 14 N. W. 481; *People* v. *Adam*, 3 Mich. 428; *People* v. *Sackett*, 14 Mich. 244; *State* v. *Ashley*, 1 Ark. 279, 513. In the Florida and Alabama cases relied on, and heretofore cited, no weight was given to the fact that two of the writs found among the enumerated writs were writs which could be issued only in exercise of original jurisdiction. Indeed, in one of these cases,— 9 Port. (Ala.) 383,—this point was not discussed, and does not appear to have been considered by the court. The language following the words, "and such other original and remedial writs," was allowed to qualify and restrict the broad grant of power to issue the specified writs in all cases when the effect of such restriction was to annul the grant of power to issue the writs of *quo warranto* and injunction. In the Florida case, the opinion first construes the contitution, without considering this point, and then gravely asserts that the fact that these two writs cannot be used except in the exercise of original jurisdiction cannot be allowed to affect the interpretation built up by ignoring in the first instance this significant point. The fallacy of such reasoning requires no exposure. It was illogical to reach any conclusion as to the meaning of the constitutional provisions involved in those cases, without giving due weight to the fact that writs were specified which could never be issued in aid of appellate jurisdiction and of superintending control over inferior courts.

Having concluded that we have authority to issue the writs particularly specified in the constitution in the exercise of original jurisdiction, it remains to be determined whether that authority is as broad as the language of the section of the constitution, standing by itself, and abstracted from the character of the tribunal on which the power is conferred, would seem to warrant. We think not. The constitution vests in the District Court the

power to issue these same writs. In most cases, application to that court for the remedies obtained by these writs affords ample redress to the suitor. It cannot be that it was designed to confer upon this court concurrent jurisdiction with the District Court, in all such cases. Especially violent and unwarranted is such an assumption when the nature of this court, and the object of its creation, are considered. This is not a forum for the litigation of private rights in the first instance. The suitor comes here for final judgment, but only after he has appealed for redress to inferior courts. There must, therefore be another class of controversies in which the judgment of this court may be invoked directly, and without the delay of previous trial in some inferior tribunal. The nature of these specified writs (or, at least, of all of them save injunction,) which this court is commanded to issue in the exercise of that original jurisdiction, makes clear the scope of that power. They are, with the single exception of the writ of injunction, prerogative writs. The writ of injunction, since the pioneer opinion of Chief Justice Ryan in *Attorney General* v. *Chicago & N. W. R. Co.*, 35 Wis. 425, 511-520, has become a *quasi* prerogative writ. Originally, these writs were issued for prerogative purposes soley. But they have come to be used for private, as well as for public, purposes; the sovereign power, through its proper representative, consenting to such use. Indeed, they are now writs of right, by the great weight of modern authority. It very little concerns the sovereign people which of two candidates for the office of constable shall hold the office. The litigation, to carry on which the state lends its prerogative writ of *quo warranto*, is often practically only a strife between two citizens for the honors and emoluments of office. Shall such controversies occupy the time of this court, when the District Court is competent to grant full relief? When used for such purpose, or for any other private end, the writs named in the constitution cease to be in reality prerogative writs, although such in form and name. They become assimilated to the ordinary process by which inferior courts acquire jurisdiction of parties in private controver-

sies. So common has become the resort to one of these writs—
*quo warranto*—in the interests of private suitors, that in many
jurisdictions a civil action has been substituted for, or given as
cumulative to, the remedy by that writ. Finding that these writs
are put to both private and public uses, and that jurisdiction to
issue them is conferred upon the District Court in all cases, to
what can the grant of power to the Supreme Court, to issue them,
refer, except to their issue in those cases in which the preroga-
tives of the sovereign power are directly, and in some public and
important respect, involved, or the liberty of the citizen is at
stake? If not, then we have concurrent jurisdiction with the
District Court to issue these writs in all cases; and in reaching
such a conclusion, we will be forced to say that the judiciary
committee of the constitutional convention, from whose hand
came, without change in the convention, these sections as finally
adopted, intended that this court, charged with higher duties, and
vested with higher jurisdiction, should yet determine in the first
instance the claims of every suitor to every office, however local
and insignificant; should nevertheless command, in the exercise
of original jurisdiction, the performance of every duty, however
trifling and unimportant to the state,—with another court, of
competent jurisdiction to administer such relief, always open, and
in which such causes are uniformly litigated. We do not believe
that that committee, at whose head was one of the foremost
lawyers of the territory, entertained the thought of distracting
the attention of this court with the original cognizance of these
private cotroversies, which can be better tried in an inferior
tribunal, knowing the importance of an undisturbed devotion to
the important duties devolving upon the court of last resort in
the decision of appeals. An inferior court having been invested
by the constitution with full and ample jurisdiction of these writs
in all cases, we are clear that the otherwise broad and compre-
hensive import of the words conferring original jurisdiction on
this court must be limited, by the rank of this court in the
judiciary of the state, and the character of the other powers

vested in the court, so that its original jurisdiction shall comport with its dignity and its high place among the tribunals of the commonwealth; and thus harmony of powers will be preserved, the classes of jurisdiction conferred upon it—appellate, superintending, and original—all, under such construction having for their objects exalted duties, the final review of the judgments of inferior courts, and the control of their actions, and the guarding and conserving of the great interests and prerogatives of the sovereign people, and of the liberty of the citizen, by original, prompt, and final action. This court will then be symmetrical in its jurisdiction. Its powers will then be homogeneous, all partaking of its high and sovereign character, and not a heterogeneous mixture of the jurisdiction of a Supreme Court with some of the jurisdiction which is uniformly vested in inferior courts. The important duties of this court will be best discharged, the main object of its creation will be the most regarded and most surely accomplished, when it gives to these higher trusts its whole energies and powers, undistracted by a multitude of suitors invoking its justice in private controversies which inferior courts can better hear and determine.

As we said before, all these writs, except that of injunction, were once exclusively prerogative writs. They were the voice of the sovereign commanding to justice, where ordinary judicial proceedings afforded no remedy. The king, as the fountain of all justice, in the exigencies of important public questions, exercised his prerogative of justice by the issue of extraordinary writs, thus bringing for decision such matters before the king's bench,—the court which represented the sovereign power in the kingdom, as our Supreme Court represents that power in the state. The philosophy of that system was the wisdom of having great questions, touching the important interests of the people as a nation, adjudicated in the higher court in the first instance. While these writs were purely prerogative writs, while they were unknown in private litigations, it was entirely fit that only the higher tribunal should have jurisdiction to issue them; but when

they came to be used for the purpose of bringing private controversies into court, it was then proper—nay, necessary—that inferior courts, of original jurisdiction as to ordinary proceedings, should be vested with power to employ them. It is with this view that jurisdiction of them is given to the District Court, although that court doubtless has power to issue them in the other class of cases; the sovereign people having the choice of the tribunal in which they will proceed. Yet there remains the same reason as before for jurisdiction in the higher court to issue them in cases affecting the great interests of the state or the liberty of the citizen. It was in continuation of this old policy that the constitution was so drafted as to give this court power to issue the specified writs. And it is equally true that it was not to initiate any change in that policy that this power was conferred. As prerogative writs issued for prerogative purposes only, the highest tribunal has, and should have, jurisdiction to employ them. As the means of instituting private litigations, the inferior court of original jurisdiction has, and should have, exclusive power to use them. Says the court, in *Attorney General* v. *Chicago & N. W. R. Co.,* 35 Wis. 425, at page 521: "The same writs are granted to those [Circuit] Courts as to this. It is impossible for a lawyer to suppose that they are granted in the same sense, and with the same measure of jurisdiction, to this court as to those. Such a proposition would shock the legal sense of any professional man. And the distinction is to be looked for, and is readily found, in the general constitutions and functions of those courts and of this." We have had less difficulty in reaching this conclusion, because similar grants of jurisdiction had been thus construed at the time our constitution was framed; and it was undoubtedly in view of this almost uniform construction that the organic law was drawn. The cases sustaining our views as to the scope of our original jurisdiction are *Attorney General* v. *City of Eau Claire,* 37 Wis. 400-446; *Attorney General* v. *Chicago & N. W. R. Co.,* 35 Wis. 425-522; *State* v. *Baker,* 38 Wis. 79; *Wheeler* v. *Irrigation Co.,* 9 Colo. 248, 11 Pac.

103; *State* v. *St. Croix Boom Corp.* (Wis.) 19 N. W. 396; *State* v. *Ashley,* 1 Ark. 309.

It is impossible to define with precision the boundaries of this jurisdiction; but the general outlines have been marked to our satisfaction in *Attorney General* v. *City of Eau Claire,* 37 Wis. 400. We quote with approval the views there expressed: "It is not enough, to put in motion the original jurisdiction of this court, that the question is *publici juris*; it should be a question *quod ad statum reipublicæ pertinet,*—one 'affecting the sovereignty of the state, its franchises, or prerogatives, or the liberties of its people.' *Attorney General* v. *Chicago & N. W. R. Co.,* 35 Wis. 425. It was repeated in that case, as it had been held in *Attorney General* v. *Blossom,* 1 Wis. 317, that this court takes the prerogative writs for prerogative jurisdiction, with power to put them to only prerogative uses proper. Prerogative writs often go in aid of private right or of local public right. But the original jurisdiction of this court is not only limited to the prerogative writs, but it is confined to prerogative causes.  *  *  *  And though the question did not arise in the case, it is quite evident from all that has any bearing on it in *Attorney General* v. *Chicago & N. W. R. Co.,* that, to bring a case properly within the original jurisdiction of that court, it should involve in some way the general interest of the state at large. It is very true that the whole state has an interest in the good administration of every municipality; so it has in the welldoing of every citizen. Cases may arise, to apply the words of Stow, C. J., 'geographically local, politically not local; local in conditions, but directly affecting the state at large.' Cases may occur in which the good government of a public corporation, or the proper exercise of the franchise of a private corporation, or the security of an individual, may concern the prerogative of the state. The state lends the aid of its prerogative writs to public and private corporations, and to citizens, in all proper cases. But it would be straining and distorting the notion of prerogative jurisdiction to apply it to every case of personal, corporate, or local right, where a prerogative writ happens to

afford an appropriate remedy. To warrant the assertion of original jurisdiction here, the interest of the state should be primary and proximate, not indirect or remote; peculiar perhaps to some subdivision of the state, but affecting the state at large, in some of its prerogatives; raising a contingency requiring the interposition of this court to preserve the prerogatives and franchises of the state, in its sovereign character; this court judging of the contingency, in each case for itself. For all else, though raising questions *publici juris*, ordinary remedies and ordinary jurisdictions are inadequate. And only when, for some peculiar cause, these are inadequate, will the original jurisdiction of this court be exercised for protection of merely private or merely local rights." See, also, pages 445, 446, of this opinion. We further quote with approval the language of the court in *Wheeler* v. *Irrigation Co.*, 9 Colo. 248, 11 Pac. 103: "We are clearly of the opinion that original jurisdiction should be here entertained only in cases involving questions *publici juris*, and that the writs for this court should, in general, be put only to prerogative uses. But these writs are frequently invoked primarily for the enforcements of private rights, while the proceedings may also affect questions of public interest. The language used, and the general policy indicated, by the various provisions of our constitution relating to the judicial department, construed in *pari materia*, as they should be, indicate that it was not the intention to have the Supreme Court entertain original jurisdiction over controversies of the kind last above mentioned; that, even though questions *publici juris* might be indirectly or remotely involved, such cases were in general to be here considered only in the exercise of appellate jurisdiction. * * * We believe that original jurisdiction of the writs mentioned, except in cases presenting some special or peculiar exigency, should not be here assumed, save where the interest of the state at large is directly involved, where its sovereignty is violated, or the liberty of its citizens menaced, where the usurpation or the illegal use of its prerogatives or franchises is the principal, and not a collateral

question." This court, in *State* v. *Nelson Co.*, 1 N. D. 88, 45 N. W. 33, cited these cases with approval, and declared that, "when the information makes out a *prima facie* case, the writ will issue only in cases *publici juris* and those affecting the sovereignty of the state, its franchises and prerogatives, or the liberties of the people." Tested by the rule recognized and declared by this court, we have concluded that the case is one calling for the exercise of our original jurisdiction. While the contest is nominally between two individuals claiming the office of the superintendent of the state asylum, the real question involved is whether a state board—the board of trustees of the asylum—shall be allowed to exercise that portion of the sovereignty of the state vested in it by the statute giving the board the general management and control of this state institution, and the power to remove at any time the superintendent, and appoint a new superintendent in his place. Rev. Codes, § 992. This institution receives a large appropriation of state funds, and is placed by the legislature under the control of a board of trustees. It certainly concerns the sovereignty of the state, not remotely and in a trifling particular, but directly and in a very important sense, whether one citizen shall defy the sovereignty of the people, and, by retaining his office of superintendent after removal, usurp to that extent the control of a great and expensive state institution. This court does not give relief in this case out of any consideration for the private rights of the relator, but solely to uphold the sovereignty of the state against a direct attack upon it in a matter of great public importance. The fact that the attorney general has declined in this proceeding to represent the relator, to appear for the board or the state, is not decisive against our jurisdiction. It will not infrequently happen that such officer will be of opinion that the law is with the defendant, and will therefore be unwilling to initiate proceedings against him. While it is the proper practice, as we said in *State* v. *Nelson Co.*, for the attorney general to make the application for the writ, yet, when it appears that he has declined to make application for it, we will not refuse to exercise

our jurisdiction, but will protect the public interests by putting forth all the powers with which the people have invested this tribunal. In many cases the court has taken jurisdiction although the attorney general has not applied for the writ, and in some of the cases he has actually represented the defense. *People* v. *State Auditors*, 42 Mich. 422, 429, 4 N. W. 274; *State* v. *Frazier*, (Neb.) 44 N. W. 471; *State* v. *Cunningham*, (Wis.) 53 N. W. 35-52; *State* v. *Doyle*, 40 Wis. 175; *State* v. *Hewitt*, 3 S. D. 187, 52 N. W. 875. In the case at bar, the majority of the board of trustees—the majority which removed Dr. Archibald and appointed Dr. Moore —appear by counsel, and urge this court to sustain them in their exercise of the sovereign power of the state conferred upon the board of trustees, of which they form the majority, and therefore the controlling element. Under the peculiar circumstances of this case, we have no hesitation in holding that the refusal of the attorney general to apply for the writ affords no reason for our declining to issue it.

We now come to the merits of the case. That the board of trustees of the asylum had power to remove the superintendent, Dr. Archibald, without cause, without notice, and in the exercise of their own unfettered and unreviewable discretion, cannot admit of doubt, unless there is something in the by-laws to be hereafter referred to which interferes with that power. They were given the power of appointment, and no term of office was fixed. Rev. Codes, § 992. In such a case, the rule is, and on principle must be, that the power of arbitrary removal is vested in the person or board vested with the appointing power, as incidental to the power of appointment, unless the law places a limitation on such power. Mechem. Pub. Off. § 445; Throop, Pub. Off. § § 304-361; *Ex parte Hennen*, 13 Pet. 230; *People* v. *Robb*, 126 N. Y. 180, 27 N. E. 267; *Miles* v. *Stevenson*, (Md.) 30 Atl. 646-648; *Lease* v. *Freeborn*, (Kan. Sup.) 35 Pac. 817; *People* v. *Fire Com'rs of New York*, 73 N. Y. 441; *People* v. *Shear*, (Cal.) 15 Pac. 92; *Newsom* v. *Cocke*, 44 Miss. 352; *State* v. *City of St. Louis*, (Mo. Sup.) 1 S. W. 757, 758; *People* v. *Hill*, 7 Cal. 97; *Smith* v. *Brown*, 59 Cal. 672. It is con-

tended, however, that, the board of trustees having appointed Dr. Archibald for the term of one year, which had not expired at the time the board assumed to remove him, and having adopted certain by-laws, it was powerless to remove him, except for cause, and after due notice to him, and an opportunity on his part to be heard with regard to the truth of the charges preferred against him. The by-laws were passed in 1885 by a board composed of persons different from the present board. There are two which it is claimed are material to this case. They are as follows: "Charges against officers of the institution must be submitted in writing, and a copy thereof shall be furnished to the officers against whom the charge is made at least one month before it is acted upon." "The superintendent, assistant physicians, steward, and matron shall reside in the hospital, and devote themselves entirely to its interests, and be subject to removal, for good and sufficient cause, at the pleasure of the board of trustees, and shall be known as the 'resident officers' of the hospital." These by-laws are to be construed in the light of the power of removal vested in the board. That power was absolute. To show that the board intended to strip itself of any portion of this power, explicit language to that effect should be pointed out. So far from there being anything in the words used to evince a purpose to divest itself of its discretion as to the sufficiency and existence of the cause for removal, the by-laws in terms declare that the superintendent shall be subject to removal for good and sufficient cause "at the pleasure of the board." They are to judge, finally, of the whole matter. Certainly, they did not, by this language, confer upon the courts the power to inquire into the sufficiency or existence of any cause for removal. They left the power as broad as they found it. Nor could they do otherwise. The by-laws which they are authorized to pass must not be repugnant to the laws of the state. The statute by necessary implication confers upon the board unlimited power of removal. This manifests the legislative policy with respect to this particular office. That statute cannot be annulled, neither can such policy

be overthrown, by a by-law passed by the mere creature of the legislature. The people, under such legislation, have a right to demand that, whenever the board shall deem it for the public interests to remove the superintendent, its power of removal shall be the absolute power vested in it by the legislature, and shall not be fettered by any restriction whatever. This power is delegated to the board for the public good, and the people cannot be prejudiced by limitations of that power to which they have not consented, and which they have not authorized the board to impose. If the board may lawfully fix a term of one year, it may likewise give the incumbent a life tenure. If it can, with legal effect, declare that the superintendent can be removed for good and sufficient cause, it may narrow the ground of removal to a particular case, and thus place this portion of the discretion vested in the board for the public welfare beyond the possibility of exercise by succeeding boards for years to come. Thenceforth the board of trustees would, for a season, be shorn of the specified power of appointment, of the incidental power of removal, and to this extent of the power of general control and management granted to it by the statute. Even if the by-laws in question were explicit in their limitation of the power of the board, we would be compelled, for the reasons set forth, to treat them as without effect. The authorities are unanimous in support of this view. *State* v. *Lane*, (N. J. Sup.) 21 Atl. 302; *City of Newark* v. *Stout*, (N. J. Sup.) 18 Atl. 943; *Williams* v. *City of Gloucester*, (Mass.) 19 N. E. 348; *Higgins* v. *Cole*, (Cal.) 34 Pac. 678; *Carter* v. *City of Durango*, (Colo. Sup.) 27 Pac. 1058; *State* v. *Johnson*, (Mo. Sup.) 27 S. W. 399; *Weidman* v. *Board of Education*, (Sup.) 7 N. Y. Supp. 309. We have not deemed it necessary to pass on the point whether these by-laws were legally repealed before Dr. Archibald was removed.

It is urged that the office of superintendent comes within the provisions of section 197 of the constitution. This may be conceded without at all affecting the absolute power of removal vested in the board by the statute. The constitution does not

declare that the officers therein referred to cannot be removed in any other way. It merely provides that for certain causes they may be removed in such manner as the legislature shall prescribe. But they may be removed for other causes, too, or without cause, if the legislature so declares, provided they are officers whose offices are created by statute. The legislature created the office of superintendent of the State Hospital for the Insane, and have, by an implication as strong as an express declaration to that effect, conferred upon the board of trustees the absolute, unreviewable power of removal at any time. Section 197 of the constitution has not taken away or impaired the power of the legislature to provide that any officer whose office is created by the legislature shall hold his office, not for any fixed term, but during the pleasure of the board or officer appointing him.

It is urged that the board did not, in fact, remove Dr. Archibald, or appoint Dr. Moore in his place. This contention rests upon an alleged irregularity in the proceedings of the board in assuming to make such removal and appointment. The motion to remove Dr. Archibald having been made and seconded, the president of the board, who appears to have acted as chairman of the meeting, refused to put the motion, on the ground of its illegality. Thereupon the motion was put by the member of the board who made it, and three votes were cast in its favor; there being no opposing votes, owing to the refusal of the two other trustees (one of them being the president) to vote. The same proceedings were had on the appointment of Dr. Moore. It is, perhaps, true that this presents a case of a failure to pursue the practice which ordinarily obtains when persons gathered together as a body are acting as a body. But it cannot be said that every violation of parliamentary usage will annul the action of the body guilty of such irregularity. The course of procedure rests largely with the discretion of the majority, provided the course adopted affords a reasonable guaranty that the sense of the body on the particular measure before it has been fairly taken. In large bodies slight deviations from established practice might be fatal,

because, in such bodies, the confusion consequent on departure from setted modes of transacting business may seriously impair or utterly destroy the rights of the minority to be heard in argument, to the end that they may convert an adverse majority into a minority. But, in smaller bodies,—one, for instance, composed of five members, sitting around the same table, each under the eye and within reach of the voice of every other member,—a strict observance of all the formalities prescribed by parliamentary usages is not necessary. The question for the court in such cases is whether, in view of the size of the body, the proceedings which were had resulting in the adoption of the motion before the body afford a guaranty that the sense of that body was fairly taken on that particular motion. Tested by this rule, we have no difficulty in reaching the conclusion that the resolution removing Dr. Archibald was legally adopted. The only irregularity in the proceedings was in the refusal of the president of the board of trustees, who assumed to act as chairman of the meeting, to put the motion; this being done by the person making the motion, on such refusal being declared to the board. The motion was regularly made and duly seconded. The two members of the board opposed to it expressed no desire to be heard in opposition to it. Whether the chairman or another should put it before the board to be voted on was a mere matter of form. Had the chairman put the motion, the result would have been the same. Certainly, the chairman of a meeting cannot paralyze the action of the majority by a refusal to discharge the functions of his office. It would be a monstrous doctrine that one man in a body of several hundred could stop all business until some court (and the power of a court to interfere is doubtful) had issued a writ of mandamus to compel action on his part, each refusal being followed by the impotence of the majority until some tribunal should come to their aid. When the chairman of the meeting refused to put the motion to remove Dr. Archibald, all that was left for the majority to do, if they were not to be thwarted in their purpose, was to have some one of

their number put the motion, and call for the vote upon it. This was done, and there is no pretense that it worked any injury to the minority, or that it deprived them of any of their rights as members of the board. And it is obvious that the same result would have been reached had the chairman himself put the motion, as it was his duty to do. He undoubtedly acted in good faith, believing that, at that time, Dr. Archibald could not be removed. But it is clear that whether such removal could then be made was a question of law, to be decided by the courts, and not by a single member of the board. As well might the speaker of a legislative assembly refuse to put the question and call for the vote on the passage of a law because he deemed it unconstitutional. It was the duty of the chairman to allow the majority of the board to take such action as they might see fit to take. What would be the legal effect of that action was purely a judicial question, to be decided in another place, and by a different branch of the government. If the chairman had ruled that the motion was out of order, and had the motion then been put by another without any appeal from the ruling of the chair, a different question would have been presented; but, even under such circumstances, we would hestitate long before adjudging a vote on the motion illegal. However, no such problem is before us; for the chairman merely declared that the point was illegal, and not that it was out of order. To declare that a motion violates law, and therefore should not be voted on, is one thing. Such a question neither the chairman nor the majority can pass upon with any legal effect. But to rule that a motion is out of order is to take an entirely different attitude with respect to it. It is a decision that some rule of the body or some practice established by parliamentary usage has been violated. This question the chairman must decide in the first instance, and above him sits the court of final review, the majority who, on an appeal from the ruling of the chair, settle the issue beyond the power of any court to change their decision. The reasoning on this point applies with equal force to the approval of the relator's bond.

The chairman refused to put the motion to approve the bond, and thereupon it was put by one of the other trustees, and was carried; three of the trustees voting to approve the bond, and the other two not voting at all.

The only question left relates to the remedy. The relator, having received the appointment, and having qualified, is in a position analogous to one who holds a certificate of election and has qualified. This *prima facie* title gives him the right to the office, pending any investigation as to the ultimate title; the defendant not being, as to him, even a *de facto* officer, but holding the office without so much as a color of title. That it is proper to try, in mandamus proceedings, all questions relating to the *prima facie* title is not open to debate in this state, since our decision in *Butler* v. *Callahan*, 4 N. D. 481, 61 N. W. 1025. See, also, *State* v. *Johnson*, (Fla.) 11 South. 845; *Conklin* v. *Cunningham*, (N. M.) 38 Pac. 170; *State* v. *Common Council of City of Duluth*, 53 Minn. 238, 55 N. W. 118. The defendant has been removed from the office, and he is not in a position to contest the right of the relator to hold the office. The state might hereafter, in *quo warranto* proceedings, try the question of the relator's eligibility to the office; but a judgment of ouster against him would not show that the defendant in this proceeding had had any right to the office during the relator's incumbency. The person who holds the *prima facie* title prays this court to compel the one who has no title whatever to turn over to him (the former) the possession of the office, with all its books and paraphernalia. His right to the writ of mandamus under such circumstances is absolutely clear. The peremptory writ will issue as prayed for.

BARTHOLOMEW, J. (concurring.) I concur in the conclusions reached in the opinion prepared by Justice Corliss. I also concur in all the reasoning of that opinion, except so much thereof as pertains to the original jurisdiction of this court. On that point I rest my concurrence solely upon the rule of stare decisis. Six years ago, and a very few months after the adoption of our constitution, this court held, in *State* v. *Nelson Co.*, 1 N. D. 88, 45 N.

W. 33, that it had original jurisdiction in cases of this character. That decision has been repeatedly acted upon since that time, and has been adopted by the legislature, and forms a part of our statute law. Section 5165, Rev. Codes. The question should no longer be considered open in this state.

The Chief Justice did not sit in this case, owing to his absence from the state.